IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-00230-WYD-KLM

CHARLES BUSH, BRAD GRIMSLEY, MARK L. HANSON, and JOHN F. NOBLE,
all individuals residing in Colorado,

Plaintiffs,

v.

FEDEX FREIGHT, INC., an Arkansas corporation doing business in Colorado,

Defendant.

---

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' FIRST CLAIM FOR RELIEF**

---

Plaintiffs, Charles Bush, Brad Grimsley, Mark L. Hanson, and John F. Noble, through

their attorneys, Martinez Law Group, P.C., submit this Response to Defendant's Motion for

Summary Judgment on Plaintiffs' First Claim for Relief ("Motion").

## <u>INTRODUCTION</u>

As is evident from the **dozens** of disputed issues of material fact, FedEx discriminated

against Plaintiffs on the basis of age – part of an ongoing and widespread problem the company

has with the way it treats older employees.[1] Plaintiffs were exemplary drivers, collectively

earning numerous safety awards (even gifts from FedEx), with over 100 years of commercial

driving experience. When they each had **one** single trailer tip over, in Rocky Mountain winter

conditions – the first such accident for each – FedEx seized the opportunity to get rid of them (to

---

[1] Several age discrimination claims have been filed against FedEx recently, including six separate EEOC complaints filed in 2011 by former and current drivers, Ray Fouts, Frank Earl III, John Ulrey, Paul C. Steely, Roger D. Davis, and Thomas Dixon; a Kansas Human Rights Commission complaint by Glen Vance; an Oregon Bureau of Labor & Industries Civil Rights Complaint; and a federal lawsuit filed in this Court by William Ray Hillis.

obtain a cheaper and more compliant workforce). FedEx did next to nothing to "investigate" the Plaintiffs' accidents, ignored the exculpatory and mitigating information it did have, and "judged" Plaintiffs' accidents "preventable." FedEx then disqualified Plaintiffs from driving for three years, effectively ending their careers, and demoted them to loading dock positions involving strenuous manual labor. In doing so, FedEx cut their pay, benefits, and hours, leaving them financially devastated. FedEx made these decisions intentionally – as the Senior Manager of Safety (and lead decision-maker) said of one Plaintiff: "we … took him down."[2] When counsel complained of age discrimination to FedEx on behalf of Grimsley and Hanson, FedEx terminated their employment within days, even commenting, "I heard you involved lawyers."

Notably, during the same time frame, younger drivers had similar accidents, some worse. For those drivers, however, FedEx did more to investigate, was more lenient with preventability judgments, and returned them to driving **within days (not three years) of their accidents**, without cutting their compensation, benefits, or hours. In addition to this disparate treatment, discriminatory (malicious) age-related comments were often directed at Plaintiffs, both witnessed and **made** by management, as FedEx admits. These comments include, "old man," "grandpa," "old bastard," "old fucker," and "old cocksucker." FedEx did nothing to stop this. Such comments poison the well – they reflect a collective bias against Plaintiffs based on age, manifest in adverse employment actions against Plaintiffs.[3] Multiple witnesses, both current and

---

[2]This is also intentional in light of the fact that FedEx does nothing to prevent age discrimination. As Liberty Morris, Human Resources Supervisor in corporate headquarters, testified: "Q. Does FedEx have a policy on retaliation? . . .A. Not that I'm aware of, no. Q. Does FedEx have a policy on age discrimination? . . .A. Not that I'm aware of, no."; and "Is there any kind of policy on what a manager should do if they hear any discriminatory comments? A. Not that I'm aware of." Ex. 46 (Morris Dep. Tr.), at 22:14-23:7; 24:14-20.

[3]See Brown v. Edison, --F.Supp.2d--, 2009 WL 817773 (E.D. Mich., Mar. 26, 2009) (summary judgment denied where Plaintiff's "poisoned well" theory - that age discriminatory comments reflected a bias against Plaintiff and influenced adverse employment actions - established a genuine issue of material fact).

former employees, under and over age 40, attested to FedEx's age discrimination against Plaintiffs and are ready to do so at trial. This is a case that must go to trial.

FedEx's Motion is based on drastically incomplete and inaccurate facts. FedEx does not even **mention** accident investigations or preventability judgments - two major processes. Nor does FedEx offer facts of comparators' accidents, with one exception. These deficiencies require Plaintiffs to present ample additional facts. Also, 79 of 85 paragraphs (93%) of FedEx's facts cite to the Declaration of Jon C. Barrett, and 38 of 85 (almost half) cite it **exclusively**. Barrett's credibility is not only sharply disputed; it is a jury determination and inappropriate for consideration on summary judgment. <u>Rivera v. Union Pacific R.R. Co.</u>, 868 F.Supp. 294, 297 (D. Colo. 1994) (quoting <u>Nat'l Aviation Underwriters v. Altus Flying</u>, 555 F.2d 778, 784 (10th Cir. 1977)). FedEx falls far short of establishing there is no genuine issue of material fact.

## <u>RESPONSE TO FEDEX'S MATERIAL FACTS</u>

### <u>Background</u>

1.      Plaintiffs Bush, Grimsley, and Hanson were employed by FedEx as Road Drivers, also called Line Drivers. <u>See</u> Ex. 1 (Bush Awards). Plaintiff Noble was employed by FedEx as a City Driver, though he was increasingly driving long hauls. <u>See</u> Ex. 2 (Noble Offer Letter). Plaintiffs were each disqualified from driving for FedEx for three years, following a rollover accident and purportedly based on their driving records, when other younger drivers similarly situated were not. <u>See</u> Ex. 3 (Bush Disqualification ("**Based on consideration of safety record** for the driver shown below the Safety Review Committee has determined: Bush, Charles E. . . . DEN-Road is disqualified to operate any FedEx Freight Inc. motor vehicle.") (emphasis added)); Ex. 4 (Noble Disqualification (similar language)); Ex. 5 (Hanson Disqualification (similar)); Ex.

6 (Grimsley Disqualification) (similar)); cf., e.g., Ex. 7 (Ryan Lee (age 33) Returned to Service); Ex. 8 (Robert Green (age 34) Returned to Service); Ex. 9 (James Marquez (age 31) Returned to Service); Ex. 10 (Cory Halling (age 34) Returned to Service).

2.      FedEx cites no documentation in support of the "facts" in Paragraph 2; it relies solely on Barrett's statements.[4] Although FedEx's drivers may consider safe driving to be a fundamental responsibility, safety is **not** the Company's priority. See Ex. 11 (Thomas Dixon Aff.), at ¶ 13 ("The number one priority at FedEx is to make sure shipments are on time.  FedEx talks about safety, but in reality that is not their concern."); Ex. 12 (Noble Dep. Tr.), at 271:10-16 ("Q. Do you agree that FedEx has a strong commitment to safety in the operation of its over-the-road vehicles? A. It has an implied commitment to safety. Q. And do you think it's sincere? A. Absolutely not."); Ex. 38 (Fouts Dep. Tr.) at 28:12-29:25 (describing FedEx's commitment to safety as "lip service" and "put[ting] out the red carpet even though its dirty underneath.").

3.      FedEx policy defines an "extremely serious" accident as a "preventable accident resulting in death, serious injury, or extensive property damage." Ex. 13 (Driver Manual: Lesson 4) at unnumbered p. 9 (FXFI-Bush_0002733). Most rollovers (including Plaintiffs') do not fit that definition; therefore, FedEx does not consider them "extremely serious." See, e.g. Ex. 14 (McNeely Dep. Tr. at 122:17-21; 149:23-150:4; 173:2-7; 209:13-210:7; 150:15-16). FedEx's "Driving Expectations (City and Road)" form does not say that drivers are expected to avoid rollovers; instead, it says in relevant part: "Comply with all applicable rules and regulations. **Make every attempt to reduce risk and the possibility of accidents** / injuries / incidents." Ex. 15 (Driving Expectations), at 1 (emphasis added).

---

[4] The credibility of a witness is a topic for the jury. See Rivera v. Union Pacific R.R. Co., 868 F.Supp. 294, 297 (D. Colo. 1994). See also Argument section, infra (beginning on page 47).

4. The information in Paragraph 4 is unreliable. FedEx does not identify the number of drivers employed for each of those years – if the fleet was larger for the 2009-2010 year, then FedEx actually may have seen a **decrease** in rollovers. Also, FedEx only cites data for accidents FedEx judged "preventable." In reality, FedEx experienced only a minor, 9% increase – not an exaggerated 52% increase – in the number of rollover accidents from 2008-2009 to 2009-2010:

> **Rollovers (annual):**
> June 1, 2008-May 31, 2009:  43
> June 1, 2009-May 31, 2010:  47
> **Increase of 9%**

See Ex. 16 (Rollover Spreadsheets).

5. FedEx's "heightened standard" idea is based **entirely** on the following language from a June, 21, 2010 email:

> Additionally, as a remedial measure to hopefully prevent future collisions, our company **applies** a heightened standard in judging whether an accident is judged preventable or whether a driver should be disqualified.  This standard is intended to be greater than that required under traditional negligence law.

Ex. 17 (June 21, 2010 Pre-Shift ("Pre-Shift"), at ¶ 4 (emphasis added). On its face, it does not describe or even mention "when a driver involved in a rollover accident would be disqualified from driving."  Mot. at 5, ¶ 5; Ex. 17, ¶ 4.

6. The "heightened standard" does not raise any bar by any measure: the word "heightened" refers to "greater than that required under traditional negligence law" – not "heightened" above some existing or past standard. Ex. 17, ¶ 4 (plain language, no mention of any other standard; present tense of "applies" indicates FedEx is already using a standard greater than negligence law). It does not mention, much less make more stringent "the circumstances under which a driver involved in a rollover accident would be disqualified from driving." Mot. at

5; ¶ 5; Ex. 17, ¶ 4. **In fact, no writing exists that describes what the "heightened standard"** **is.** Ex. 18 (John Hill Dep. Tr.) at 166:11-15 ("Q. What is the whole heightened standard? A. I don't have a document that defines what you're looking for. You're looking for a crisp definition, and I don't have that."). FedEx does not attempt to state what the heightened standard is, anywhere in its Motion. See generally, Mot. According to Mark McNeely, the lead individual in preventability judgments (and who judged Plaintiffs' accidents), **the preventability standard** **never changed.** Ex. 14 at 62:13-17 ("Q. Has FedEx's definition of what's preventable ever changed in any way? A. Of what's preventable? Q. Uh-huh. A. **No**.").

7.     The Pre-Shift was to be conveyed by June 30 as an admonition that "aggressive driving behaviors" "must be eliminated." See Ex. 17 at ¶¶ 1, 2, 3, and 5 (four of six paragraphs on eliminating "aggressive" driving). It did not announce a new standard. See Ex. 17, ¶ 4.

8.     The Pre-Shift was unrelated to the Nov. 2, 2010 policy update over four months later. Cf. Ex. 17 and Ex. 13, unnumbered pp. 7-8. The Nov. 2, 2010 policy update added the "Standard of Care," which (again) did not introduce a new standard, nor did it refer to a new standard that had been implemented in June; instead it reiterated the standard that had always been in place: "In deciding whether an accident is **preventable**, the company applies a higher standard of care **than required under traditional negligence law**." Ex. 13 at unnumbered p. 7 (FXFI-Bush_0002731) (emphasis added). The "higher standard" refers **only to preventability** **and not to disqualification**, as FedEx insists. Cf. id. and Mot. at 5, ¶ 6.

9.     The "November 30, 2010 Pre-Shift" does not announce the incorporation of "heightened standard" language. (Ex. 7 to Mot.) Instead, it merely requests that all operations leadership and driver employees replace the old Driver Manual Lesson 4 with the new one,

revised November 2, 2010, with a due date of November 30, 2010. The updated policy does not introduce a new standard, or even refer to a new standard implemented in June.

10.     Exhibit 18 to FedEx's Motion is a copy of Lesson 4 from the Driver Manual implemented February 25, 2010. (Ex. 18 to Mot. (last page with date of revision)). That policy was in effect until November 2, 2010, the date of the next version of this policy. See Ex. 13.

11.     Exhibit 6 to FedEx's Motion is a copy of Lesson 4 from the Driver Manual implemented November 2, 2010. (Ex. 6 to Motion (see last page with date of revision)).

12.     Bush testified only that he had access to the Driver Manual and that the policy in effect at the time of his accident was the November 2, 2010 version of Lesson 4. See Ex. 19 (Bush Dep. Tr.) at 105:19-106:2. Grimsley testified that at one point he reviewed the Driver Manual but was uncertain whether he had read the November 2, 2010 version of Lesson 4. See Ex. 20 (Grimsley Dep. Tr.) at 96:5-97:13. Hanson does not recall whether he reviewed the Driver Manual and he does not recall the part about disqualification. See Ex. 21 (Hanson Dep. Tr.) at 97:12-25. Noble met all requirements to read the Driver Manual, and he assumes Lesson 4 was in the Driver Manual. See Ex. 12 (Noble Dep. Tr.) at 180:14-25.

13.     From 1998 through at least August 23, 2012 (his deposition), McNeely, Field Safety Advisor for the Kansas City District (the District in which Plaintiffs' and all comparators' accidents were located), led preventability judgments – a separate process from disqualifications. See Ex. 14 at 25:8-21. Barrett participated in those preventability judgments for at least the five years prior to August, 2012. See id. at 94:12-95:16. For any given judgment, **Barrett knows who the driver is**. See id. at 109:25-110:2. Barrett is also on the Safety Review Committee; **he leads it**. See id. at 110:3-5; see also Ex. 22 (Jon Barrett Dep. Tr.) at 275:1-3. If a driver is on

Driver Safety Review, the Safety Review Committee, led by Barrett, decides whether to disqualify that driver. See Ex. 22 at 275:1-3.

14.     FedEx's purported "heightened standard" – in truth a vague indication that FedEx may treat accidents by a standard differing (in an amorphous way) from negligence law – **does not even mention speed**. See Ex. 17; see also ¶ 5, supra (quoting the "heightened standard" language). Even according to Barrett, **nowhere in writing** does any policy exist saying that, where speed is a factor, a driver will be disqualified:

> Q. Under what FedEx policy, written policy, was his disqualification entered?
> A. We had a heightened focus on all rollover accidents, and if you had a rollover accident and it was determined that speed was a part of the causation of that accident or a cause of that rollover accident, you were disqualified.
> Q. That wasn't a written policy, though, right?
> A. There was a preshift that went out.
> Q. But it wasn't a written policy at FedEx?
> A. Not a written policy, no. **I don't believe we had a written policy on the speed issue**.

Ex. 22, at 222:21-223:9 (emphasis added). Notably, the only record citations provided in support of FedEx's Paragraph 14 are statements made by Jon Barrett. (See Mot. at ¶ 14, citing Barrett's Declaration (Ex. 3 to Mot.), Barrett's Deposition Transcript (Ex. 4 to Mot.), and Barrett's verified interrogatory answers. (Ex. 20 to Mot.)). Even FedEx's proffered expert witness on policies had no documentation on which to base his understanding of the "heightened standard" relating to "when speed is a factor"; he only learned this from FedEx's counsel and Barrett:

> Q. Who explained to you what the heightened standard is?
> A. I heard discussion from both Mr. Martin and Mr. Barrett.
> Q. What do you mean you heard discussion from them?
> A. Well, I -- you asked me who I heard it from, and I heard it from Mr. Martin and Mr. Barrett.
> Q. What was their explanation of what the heightened standard is?
> A. As I recall, the discussion was that if a driver was involved in a rollover crash, that's what prompted this heightened standard, they were having an elevated

number of rollover crashes in June of 2010. And as I recall, **if you're a driver and you're involved in a rollover crash and speed was at all a factor, you were going to be disqualified.**
. . .
Q. Do you have any understanding of what the heightened standard is based on, anything other than Exhibit 205 [Ex. 17 to this Response] and your discussions with Mr. Barrett and Mr. Martin?
A. No.

Ex. 18, at 167:13-168:6, 170:4-8 (emphasis added).

15.     The "heightened standard" was **never** even a policy or procedure "in effect." See ¶¶ 5-14, supra. The relevant policies in effect were the February 25, 2010 Lesson 4 policy, directly succeeded by the November 2, 2010 Lesson 4 policy. See Ex. 18 to Mot; Ex. 13. Nonetheless, even looking at June 21, 2010 through September 1, 2011 – the period FedEx claims to have its "heightened standard" – the data shows that FedEx disqualified drivers over age 40 at a higher rate than drivers under age 40 in the Northwest Region (the region in which all Plaintiffs' and comparators' accidents occurred):

**NOWE Region Accidents, May 1, 2008 – Aug. 1, 2012**
Total: 67
Over Age 40:  50
Und0*/8er Age 40:  17
Of Those Over Age 40:  24/50 were disqualified, or **48%**
Of Those Under Age 40:  5/17 were disqualified, or **29%**

**NOWE Region Accidents During "heightened standard," June 21, 2010–Sept. 1, 2011**
Total: 32
Over Age 40:  22
Under Age 40:  10
Of Those Over Age 40:  18/22 were disqualified, or **82%**
Of Those Under Age 40:  5/10 were disqualified, or **50%**

See Ex. 23 (NOWE Region Accident List); see also Ex. 16 (on which Ex. 24 was largely based).

16.     Again, the "heightened standard" is neither a time period, nor a policy change. See ¶¶ 5-15, supra. In any event, the data provided by FedEx shows that there was actually a

9

**53.9% <u>increase</u> in accidents** for the period of June 21, 2010 through September 1, 2011,

compared to the period prior:

> <u>May 2, 2008–June 20, 2010</u>:  102 rollover accidents in 780 days, or **0.13 accidents / day**.
> <u>June 21, 2010-Sept. 1, 2011</u>:  89 rollover accidents in 438 days, or **0.20 accidents / day**.
> 0.13x = 0.20; x = 1.539; or **53.9% increase**.

<u>See</u> Ex. 16.

17.     FedEx never "discontinued" using the "heightened standard"; in fact, the next version of the Lesson 4 Policy, implemented September 19, 2011, contains the **exact same language** as the prior, November 2, 2010 version of the same policy – the one which, according to FedEx, added the "heightened standard" to the Driver Manual in the first place:  "In deciding whether an accident is preventable, the company applies a higher standard of care than required under traditional negligence law." <u>See</u> Ex. 24 (Sept. 19, 2011 Lesson 4 Policy), at 8; <u>cf.</u> Ex. 13, at 8 (the immediately-preceding, Nov. 2, 2010 version of that policy, containing verbatim language); <u>see also</u> Mot. at ¶ 8 (FedEx states, "The Heightened Standard . . .was added to the FXFI Driver Manual on November 2, 2010.").

18.     Sometime between July and November, 2011, FedEx began using "scorecards" assigning point values to various violations or accidents. <u>See</u> Ex. 25 (earliest scorecards at pages 2 and 4, the first seemingly related to a July, 2011 accident, and the second dated November 1, 2011).  The scorecard was driver-recommended, and FedEx began using it in response to drivers' need for "better understanding of the safety review process." <u>See</u> Ex. 22 at 125:24-126:10.  **Such quantifiable criteria for disqualification was not used prior, at the time of Plaintiffs' accidents**. <u>See</u> <u>id.</u> at 124:22-125:3. The company did not "switch" to a new safety review system for determining disqualifications; instead, the latest September 19, 2011 Lesson 4 Policy still

provided for full driver safety reviews, to be conducted by the Safety Review Committee, to determine disqualifications.  <u>See</u> Ex. 24, at 1-2; <u>cf.</u> Ex. 13, at 2.

**<u>Charles Bush</u>**

19. Plaintiffs admit Paragraph 19 of FedEx's Motion.

20. FedEx Human Resources approved Bush's hire on February 15, 2006, when Bush was age 56. <u>See</u> Ex. 26 (Bush Hire Approval). HR was informed of, but not involved in, the decision to disqualify Bush. <u>See</u> Ex. 3 (decision-makers in Safety & Compliance department).

21. Bush was involved in a rollover accident on December 21, 2010, as a result of his brakes locking up. <u>See</u> Ex. 3 at p. 4 ("brakes locked up causing trailer to exit roadway and over-turn."). Bush's accident was judged preventable by Mark McNeely, Jon Barrett, and two others. <u>See</u> Ex. 22 at 46:10-17. Bush was then disqualified by the Safety Review Committee, led by Jon Barrett. <u>See id.</u> at 275:1-13; <u>see also</u> Ex. 3 at 1.

22. The Safety Review Committee, led by Jon Barrett, disqualified Bush from driving.  <u>See</u> ¶ 21, <u>supra</u>.  Bush was disqualified for a period of three years.  <u>See</u> Ex. 13, at 10 (a disqualified employee may be considered for re-qualification after a minimum of three years).

**<u>Brad Grimsley</u>**

23. Plaintiffs admit Paragraph 23 of FedEx's Motion.

24. Grimsley was hired on Feb. 15, 2010 at age 44. <u>See</u> Ex. 27 (Grimsley Hire Form).

25. On the night of May 18, 2011, Grimsley was driving a tractor and two trailers for FedEx, on eastbound I-70 from Grand Junction, through the Rocky Mountains, to Denver.  <u>See</u> Ex. 12 to Mot; Ex. 20, at 94:20-95:2.

26.     When Grimsley emerged from the Eisenhower Tunnel on the East side, I-70 was wet but there was no snow.  See Ex. 12 to Mot., at 3 ("After the tunnel the roads were wet but no snow.").  When Grimsley was around mile marker 218, the roads were "covered with snow." See id.  Grimsley's speed was no more than 30 mph.  See id.; see also Ex. 28 (Expert Report of Jerry Ogden), at 42 (based on time and distance, calculating Grimsley's speed at 26 to 30 mph)).

27.     Roughly 50-70 yards ahead, a car pulled off the shoulder without signaling and merged into Grimsley's (far right) lane going 5 mph or less. See Ex. 12 to Mot. at 3; see also Ex. 28 at 43. Grimsley had to change lanes rather than risk hitting the car, a decision to avoid a possible accident, consistent with FedEx policy. See Ex. 12 to Mot. at 3; Ex. 28, at 43; Ex. 13, at 1 ("every attempt must always be made to reduce the possibility of accident occurrence.").

28.     While Grimsley went to change lanes, because of the extremely slick roads, his drive axel came out from under him and his tractor jackknifed, spinning 180 degrees, then the back trailer tipped over. See Ex. 20, at 108:24-109:2; Ex. 12 to Mot., at 3 ("I have two full winters running this lane with FedEx & another company and have never seen a road so slick.")

29.     Plaintiffs admit Paragraph 29 of FedEx's Motion.

30.     The Safety Review Committee, led by Barrett (who also participated in Grimsley's preventability judgment), disqualified Grimsley from driving. See Ex. 22 at 46:10-17; id., at 275:1-13; see also Ex. 6 at 1. Grimsley was disqualified for a period of three years. See Ex. 13, at 10 (a disqualified employee may be considered for re-qualification after a minimum of three years).  Barrett stated as to Grimsley's disqualification that he and the Safety Review Committee "took him down."  See Ex. 22, at 229:20-230:4.

**Mark Hanson**

31.     Plaintiffs admit Paragraph 31 of FedEx's Motion.

32.     Hanson was involved in a rollover accident around 3:45 a.m. on Jan. 19, 2011, as a result of whiteout conditions. <u>See</u> Ex. 42 (Hanson Statement). Hanson's accident was judged preventable by Mark McNeely, Jon Barrett, and two others. <u>See</u> Ex. 22 at 46:10-17. Hanson was then disqualified by the Safety Review Committee, led by Barrett. <u>See</u> <u>id.</u> at 275:1-13; Ex. 5 at 1.

33.     The Safety Review Committee, led by Jon Barrett, disqualified Hanson from driving. <u>See</u> ¶ 32, <u>supra</u>. Hanson was disqualified for a period of three years. <u>See</u> Ex. 13, at 10 (a disqualified employee may be considered for re-qualification after a **minimum** of three years).

**<u>John Noble</u>**

34.     Plaintiffs admit Paragraph 34 of FedEx's Motion.

35.     Noble worked for FedEx Express for 22 years prior to being hired at FedEx Freight, Inc. on June 14, 2010, at which time Noble was 49 years old. <u>See</u> Ex. 12, at 14:11-18; <u>see also</u> Ex. 2 (offer of employment accepted June 14, 2010).

36.     Noble was involved in a rollover accident on December 7, 2010, as a result of icy road conditions and wind gusts. <u>See</u> Ex. 29 (Noble Typed Statement to HR); Ex. 28, at 36; Ex. 12, at 225:9-226:23. Noble's accident was judged "preventable" by Mark McNeely, Jon Barrett, and two others. <u>See</u> Ex. 22 at 46:10-17. Noble was then disqualified by the Safety Review Committee, led by Jon Barrett. <u>See</u> <u>id.</u> at 275:1-13; Ex. 4 (entering disqualification).

37.     The Safety Review Committee, led by Jon Barrett, disqualified Noble from driving. <u>See</u> ¶ 36, <u>supra</u>. Noble was disqualified for a period of three years. <u>See</u> Ex. 13, at 10 (a disqualified employee may be considered for re-qualification after a minimum of three years).

38.     FedEx cites no documentation in support of Paragraph 38 of its Motion. In any event, weather conditions and vehicle functionality can change instantaneously (as in Bush's case), especially in the Rocky Mountains; therefore, "simply assuming that other made it through the area without incident, therefore [Plaintiffs] should have as well is not logical."  Ex. 28, at 24.

**FedEx's Safety Review Committee**

39.     The Safety Review Committee, from at least 2006 through present, determines whether a driver involved in a rollover accident (that has already been judged preventable by at least one of the same individuals) will be disqualified from driving.  See Mot., at ¶ 42 (admitting that the Safety Review Committee operated at least since 2006); Ex. 22, at 125:16-19 (Safety Review Committee still operating at present).

40.     The February 25, 2010 Lesson 4 policy and the November 2, 2010 Lesson 4 policy both provide (verbatim) that the members of the Safety Review Committee are: "MD of Human Resources, Sr. Manager Safety, Sr. Manager Transportation, Sr. Manager People Development, and Sr. Manager Purchased Transportation" – a different list than FedEx provides in Paragraph 40 of its Motion. Ex. 18 to Mot., at 2; Ex. 13, at 2.

41.     FedEx cites no documentation in support of the purported facts in Paragraph 41 of its Motion; instead, it relies solely on Barrett's statement.  See Mot. at ¶ 41. If, as of 2010, five individuals had a combined 62 years of experience "with FXFI," then even FedEx believes and admits that "FXFI" or FedEx Freight, Inc. existed long before 2008, contrary to its later assertion in its Motion.  See, e.g. Mot., at ¶¶ 56-57.

42.     FedEx did **not** use the same process for every review for six years; to the contrary, the unbridled discretion in its "processes" fosters discrimination. See, § II.B.2, infra.

According to FedEx, during some time periods it considered a driver's full driving history on safety review, and during others, it only looked at the rollover accident triggering safety review, even though **there is no policy or procedure reflecting this**. <u>See</u> Ex. 22, at 113:21-114:19 ("was there some policy or procedure requiring that a rollover accident be weighed a certain amount and the rest of a driver safety review would not matter as much?  A. **No**.") (emphasis added).  In fact, even during the time frame of June 21, 2010 through late 2011, FedEx contradicts itself on whether it considered driver history, or just the rollover accident:

<u>Bush Disqualification</u>:
"Q. Did Mr. Bush's driving record factor into his disqualification?
A. **No**.
Q.  It was simply the rollover accident in which, as you say, speed was an issue?
A.  That's correct."
(Ex. 22, at 176:18-23) (emphasis added).

<u>But</u>: "When the Committee made the decision to disqualify Bush, in addition to the facts relating to the December 21, 2010 roll-over accident, the **Committee also considered Bush's driving record**, summarized below, for the four years he had been employed by FXFI."  May 9, 2012 Scheduling Order (Dkt. 15), at 8.

<u>Hanson Disqualification</u>:
"Q. Aside from his rollover, what about his driving record led you to disqualify him?
A.  During that period of time, **we looked at the rollover accidents**.
Q.  Only?
A.  **Only**."
(Ex. 22, at 209:3-8) (emphasis added).

<u>But</u>: "Q. So nothing else about this driving record for Mr. Hanson led you to disqualify him other than the rollover?
A. **We would have taken that into consideration**, but the primary reason that Mr. Hanson was disqualified was because of the rollover.
(Ex. 22, at 209:9-15) (emphasis added).

<u>Grimsley Disqualification</u>:
"Q. How did Mr. Grimsley's driving record factor into his disqualification?
A. The overall safety record would not have been taken into consideration **very much** at all if it was a rollover accident where speed was involved.  That one rollover would have been a determining factor."

(Ex. 22, at 224:1-7) (emphasis added).

But: "Q. This is Mr. Grimsley's driver safety review again.  Looking at this record, what is the main reason Mr. Grimsley was disqualified?
A. Because he had a rollover accident.
Q. **Nothing else about his record factored in?**
A. **No.**
(Ex. 22, at 230:8-14) (emphasis added).

Noble Disqualification:
"Q. What about his driving record led you to disqualify him?
A.  12/7/2010, a rollover accident.
Q.  Anything else?
A. **No.**"
(Ex. 22, at 244:17-21) (emphasis added).

Ryan Lee Reinstatement:
"Q. In his violation review record did that factor into your consideration on driver safety review?
A. It would have not been taken into consideration, or **if it did, it was very, very minute** because we were focusing on the rollover accidents."
(Ex. 22, at 254:3-12) (emphasis added).

(Plaintiffs further address Paragraph 42 of FedEx's Motion in Paragraph 44, below.)

43.    FedEx fails to discuss preventability judgments, a separate process from disqualifications in which the decision-makers know what driver they are judging. See Additional Disputed Facts, Section II, supra. Nonetheless, Plaintiffs agree that if a rollover accident was judged "preventable," this would trigger safety review by the Safety Review Committee, led by Barrett. But, as shown above in Paragraph 42, FedEx contradicts itself on whether a driver is disqualified "as a result of the accident," or disqualified as a result of the driver's driving record *in combination with* the accident.

44.    (See generally, Plaintiffs' response in Paragraph 42, above.)

(a)    FedEx is unable to cite any documentation in support of its purported facts in Paragraph 44(a); instead it either cites nothing or relies solely on statements by Barrett. See

16

Mot. at ¶ 44(a). FedEx admits there is no policy or procedure calling for one member of the Committee to refrain from voting. Ex. 22, at 104:23-105:3. In any event, Barrett testified several times in a manner that includes himself in the decision-making process for disqualifications:

- "**We** would take this into consideration, but it certainly didn't play a huge role in whether **we** would disqualify a driver. **We** would focus on the rollover accident." Ex. 22, at 114:10-13 (emphasis added).

- "**we** would have disqualified Mr. Bush because **we** determined that he had a rollover accident that was preventable where **we** determined that speed was an issue, a cause." Ex. 22, at 182:17-20 (emphasis added).

- "anytime **we** disqualified a driver, the disqualification file is started." Ex. 22, at 201:24-25 (emphasis added).

- "**We** don't take safety awards into consideration when **we're** reviewing drivers." Ex. 22, at 202:3-4 (emphasis added); <u>see also</u> <u>id.</u>, at 204:16-17 (similar).

- "It appears that they're on there, but **we** never took that into consideration." Ex. 22, at 202:7-8 (emphasis added).

- "**We** didn't disqualify him for having an outstanding safety record. **We** disqualified him for having a rollover accident where speed was involved." Ex. 22, at 208:3-6 (emphasis added).

- "**We** would have taken into consideration the history here, but it certainly did not have an effect on **our** decision for the rollover . . . ." Ex. 22, at 209:18-21 (emphasis added).

- "And yes, the sole reason that **we** would have disqualified him, Mr. Hanson, was the rollover accident." Ex. 22, at 210:2-5 (emphasis added).

- "It felt like **we** had enough to judge it preventable, and **we** knew **we** were meeting as a review, and took him down." Ex. 22, at 230:3-4 (emphasis added).

(b)     FedEx cites no documentation in support of the first sentence of its Paragraph 44(b); it relies solely on statements by Barrett. Plaintiffs are aware of no evidence that would confirm or deny this. As to the second sentence, Exhibit 13 to the Motion is not an

"unredacted copy" of the Driver Safety Review sheet used for Bush. To the contrary, Bush's name has been redacted, as well as handwriting. The actual "unredacted copy" of Bush's Driver Safety Review sheet is attached. See Ex. 30.

(c)     FedEx cites no documentation in support of the purported facts in Paragraph 44(c); it relies solely on statements by Barrett. Nonetheless, according to FedEx, Barrett would receive a Driver Safety Review sheet with the driver's name and domicile on it, and he would have that while leading Safety Reviews. Ex. 22, at 203:1-13; id. at 275:1-3. For the Kansas City District (the domicile of Plaintiffs, Ryan Lee, and other comparators), Barrett also – days or even hours earlier – judged those accidents as to preventability. See Ex. 14, at 109:14-19; Ex. 22, at 46:10-17; see also, e.g. Ex. 6 (Grimsley's accident judged preventable at 12:28 p.m., May 19, 2011, and the notice of his disqualification was circulated less than five business hours later, at 7:42 a.m., May 20, 2011). Preventability judgments are not done anonymously; in other words, those judging preventability know who they are judging. See Ex. 14, at 92:6-9.

(d)     FedEx is unable to cite documentation in support of the purported facts in Paragraph 44(d); instead, it relies solely on statements by Barrett.  See Mot. at ¶ 44(d). Further, the cited testimony (cut short) does not support FedEx's "fact" – it does not even mention age:

> Q. Okay. You took part in Mr. Bush's driver safety review, correct?
> A. Yes.
> Q. You knew you were reviewing Mr. Bush during his driver safety review, correct?
> A. No.
> Q. Why not?
> A. Because during a safety review process, I -- I did not look at names. It made no difference to me who it was.
> Q. But you had within the last few days or a week been part of judging Mr. Bush's accident, correct?
> A. That's correct, if I was a part of that judgment.

> Q. So how would you not know who you're reviewing on a driver safety review days later?
> A. I make it a point not to know names because it's not important who they are. What's important is their safety history. And if we speak about all accidents, we get hundreds of accident reports a week, and I look at every one of them, so I wouldn't look at names.
> Q. Can you say with certainty that you did not know you were reviewing Mr. Bush in his driver safety review?
> A. **No, I can't say that**.

Ex. 22, at 76:2-77:3 (emphasis added). FedEx's other citation is circular; it is an unsworn statement that cites to the same testimony. See Ex. 3 to Mot., at ¶ 7(c).

(e)     FedEx is unable to cite any documentation in support of the purported facts in Paragraph 44(e); instead, it relies solely on statements by Barrett. Further, FedEx has not – for a single driver – produced a copy of the set of documents distributed to the Safety Review Committee. Nor can it, as FedEx admits it did not keep those "redacted" forms: "FedEx acknowledges that it did not retain a copy of the redacted DSR Cover Sheet form." Resp. to Plfs' Mot. for Sanctions (Dkt. 67), at 12.

(f)     FedEx is unable to cite any documentation in support of the purported facts in Paragraph 44(f); it relies solely on Barrett's statements. Again, FedEx has not produced any documentation of what was distributed to the Safety Review Committee, for any given driver. See Para. 44(e), above.

(g)     Plaintiffs dispute that the Safety Review Committee made disqualification decisions according to the (undocumented) process outlined in Paragraph 44(g)(1-3) of the Motion, as stated below.

(1)     Plaintiffs do not dispute that Barrett leads driver safety reviews; but, at least for drivers of the Kansas City District, he does so with full knowledge of the driver

19

at issue, having just participated (within days or less) in judging that driver's accident "preventable." Ex. 22, at 46:6-47:18; Ex. 14, at 109:14-19; see also, e.g. Ex. 6 (showing Grimsley was disqualified hours after his accident was judged preventable).

(2)     FedEx cites no documentation in support of its purported facts in Paragraph 44(g)(2); it only relies on Barrett's statements. Further, there is no documentation of what the Safety Review Committee members received or used during safety reviews; and Barrett would have no way of knowing who saw what in a room of five people. In fact, Barrett indicated that the Safety Review Committee does review documents:

> So what this tells me is that those files that we've got imaged are incomplete, for whatever reason, imaging problems, not getting the image documents in the right ones. The most precise file that I can tell you that **what <u>we</u> would have looked at** is the DQ file because it has numerous items in there and is the most complete. We have produced every document there is, but to give a better idea for me to look at this and judge preventability, I would need to look at the disqualification file to see everything that we would have looked at to judge it preventable, so I could tell you why it would be judged preventable today. And I could also at that point tell you **what <u>we</u> would have looked at the safety review**, what I would have looked at and relayed to the other members, so this should be here.

Ex. 22, at 174:2-19.

(3)     FedEx cites no documentation in support of its purported facts in Paragraph 44(g)(3); instead, it relies solely on statements by Barrett.  See Mot., at ¶ 44(g)(3). What FedEx calls the "information necessary" and the "other relevant information" is all a question of fact.

(h)     FedEx cites no documentation in support of its purported facts in Paragraph 44(h); it relies solely on statements by Barrett. Barrett had full information on the driver, including name, age, and domicile, because he judged preventability of that driver's accident; then, within days, he led the Safety Review Committee in determining disqualification.

See Ex. 22, at 46:6-47:18; Ex. 14, at 109:14-19; see also, e.g. Ex. 6 (showing Grimsley was disqualified hours after his accident was judged preventable).

(i)     FedEx cites no documentation of an anonymous safety review "process"; instead, again it relies only on Barrett's statements.  In fact, no written policy or procedure exists that supports Paragraph 44(i); in reality, the policy concerning driver safety reviews in effect at the time of Plaintiffs (and comparators') accidents does not contemplate anonymity:

> A final decision regarding disqualification will be made within a maximum of 3 business days from the date of the last event, unless investigation circumstances or availability of reports dictate otherwise.  Decisions are made by majority vote. Until the review is completed, the driver will remain off duty without pay.  If the review requires a period longer than 3 business days from the date of the last event, the employee may be assigned to an available non-driving position, if the employee is qualified.  This assignment can only take place after the 3 business days have passed.  The employee could remain in this non-driving position until the review is complete.

Ex. 13, at 2.

45.     Again, FedEx cites no documentation in support of its purported facts in Paragraph 45; it only cites statements by Barrett. Even if the driver's name, age, and domicile were not "provided" to the Safety Review Committee members, that does not mean (a) the Committee did not know or surmise that information anyway, or (b) Barrett, who did know that information, did not influence the Committee's decision. The circumstances show that, in the middle of disqualifying Plaintiffs, all over age 40, FedEx did not disqualify Ryan Lee, age 33 (whose accident is addressed herein at ¶¶ 139-149). See, e.g. Exs. 3–6 (announcing disqualifications of Plaintiffs); cf. Ex. 7 (returning Lee to service).

46.     FedEx's policy states: "If a driver is disqualified by the Safety Review Committee, an appeal of that decision may be made." Ex. 13, at 2. Plaintiffs each timely

appealed their disqualifications. <u>See</u> Exs. 32 – 35 (four disqualification appeals). But each Plaintiff's appeal was promptly denied with nothing but a three-sentence form letter offering no explanation. <u>See</u> Ex. 36 (combined form letters to Plaintiffs upholding their disqualifications). Plaintiffs are not aware of any driver who has ever had a disqualification overturned on appeal; in fact, Noble wrote a letter to HR stating he believed the appeal was "rubber stamped" and "the facts were never really considered." <u>See</u> Ex. 29, at 1.

47.     FedEx cites no documentation of the purported facts in Paragraph 47 of FedEx's Motion; instead, it relies solely on statements by Barrett. Plaintiffs are without sufficient information to admit or deny where the Safety Review Committee members lived and worked.

48.     Paragraph 48 of FedEx's Motion is a reiteration of Paragraph 41. In addressing it, therefore, Plaintiffs repeat and incorporate their Paragraph 41, above. <u>See</u> ¶ 41, <u>supra</u>.

**<u>Plaintiffs' Comparators</u>**

49.     During discovery, Plaintiffs identified nineteen (19) comparators who, upon information and belief, were drivers under age 40 who had rollovers and were not disqualified. <u>See</u> Ex. 14 to Mot. (excerpts of Plaintiffs' discovery responses identifying younger comparators).

50.     Addressing FedEx's chart on page 12 of its Motion, Plaintiffs dispute that the column, "Employer at Time of Accident," should list anything other than "FXFI" for all lines, for reasons identified below. <u>See</u> ¶¶ 56-57, <u>infra</u>. Plaintiffs agree that the column, "Name," lists the nineteen individuals Plaintiffs identified as comparators (including the two who had two rollovers each). <u>See</u> Ex. 14 to Mot. As for the "Date of Rollover" and "Age at Rollover" columns, Plaintiffs agree with the information contained in lines 1, 2, 3, 5a, 5b, 9, 10, 11, 15, 16, 17, 18, 19a, and 19b, to the extent that documents produced by FedEx reflect this information.

FedEx has produced no documentation, nor does it cite any, reflecting the information contained in lines 4, 6, 7, 8, 12, 13, or 14 of its chart. <u>See</u> Mot. at 12 (chart). Finally, the spreadsheets FedEx produced early in this lawsuit, purporting to list all of the rollover accidents in a given time period, should have included accident information for Todd Holbrook (based on the accident date FedEx lists in line 14 of its chart), but they do not. <u>See</u> Ex. 16. Plaintiffs therefore dispute FedEx's production (and at the very least it is a dispute regarding credibility of evidence that is appropriately to be decided by the jury).

51.     Plaintiffs dispute that the chart is accurate (or at least credible). <u>See</u> ¶ 50, <u>supra</u>.

52.     The "heightened standard" was not a policy or procedure "in effect," as FedEx admits on at least three occasions:

> Q.  Aside from preventability, though, is there a written policy on why his disqualification was appropriate?
> A.  The preshift we put out. **The policy, no, not that I'm aware of**.

Ex. 22, at 176:13-17.

> Q.  Do you know what policy – under what policy his disqualification was appropriate?
> A.  We as a company determine that we are going to take a more serious look at rollover accidents, and at that point if we determine that speed was involved, we would disqualify the driver.
> Q.  But under what written policy?
> A.  We put a preshift out.  It was a communication. **It wasn't a policy**.

Ex. 22, at 197:12-20.

> Q.  Under what FedEx policy, written policy, was his disqualification entered?
> A.  We had a heightened focus on all rollover accidents, and if you had a rollover accident and it was determined that speed was a part of the causation of that accident or a cause of that rollover accident, you were disqualified.
> Q.  That wasn't a written policy, though, right?
> A.  There was a preshift that went out.
> Q.  But it wasn't a written policy at FedEx?
> A.  **Not a written policy, no**. I don't believe we had a written policy on the speed

issue.

Ex. 22, at 222:21-223:9.  Plaintiffs therefore dispute that there is any time period associated with any "heightened standard" being "in effect."  See also, ¶¶ 5-18, supra.

53.     Again, Plaintiffs dispute that there was a time period during which the "heightened standard" was "in effect."  See ¶¶ 5-18, and 52, supra.  In any event, even looking at accidents occurring between June 21, 2010 and September of 2011 (the timeframe FedEx ascribes to the "heightened standard"), none of the individuals FedEx lists in Paragraph 53 were driving in the Kansas City District; therefore their accidents were not investigated by Mark McNeely and judged preventable by McNeely and Barrett, as Plaintiffs and the named comparators were.  See Ex. 23 (none of those names in the KC Division). In fact, of the seven individuals FedEx lists, six of them were not even in the Northwest region. See id. Those seven are not similarly situated to Plaintiffs.  Looking at Northwest region data, FedEx disqualified drivers over age 40 at a much higher rate than they disqualified drivers under age 40:  82% compared to 50%, respectively.  See id.

**FedEx's Description of Entities**

54.     FedEx offers no record support for the purported facts in its Paragraph 54; instead it only cites Barrett's statement FedEx's website lists the 1998 acquisition of Caliber System Inc., which included carrier Viking Freight, but Viking Freight did not become FedEx Freight West until 2002.  See Ex. 37 (corporate timeline posted on FedEx's website).

55.     FedEx offers no record support for the purported facts in its Paragraph 55; it only cites Barrett's statement. FedEx's website states that in 2001, "FedEx Corp. acquires American Freightways, a less-than-truckload carrier serving the 40 eastern states in the U.S."  Ex. 37.

American Freightways did not become FedEx Freight East until 2002. See id.

56.     According to FedEx's website, FedEx Freight existed at least as early as 2002: "**FedEx Corp. brands two of its LTL companies together as FedEx Freight.**" Ex. 37 (entry for 2002); see also Ex. 39 (history of FedEx Freight on company website) ("by combining Viking and AF, FedEx Corp. **created FedEx Freight** to offer one-stop shopping for LTL customers who require top-quality, highly reliable freight service.") FedEx Freight simply had two geographic components, FedEx Freight West and FedEx Freight East. See id. On December 28, 2008, FedEx Freight West and FedEx Freight East underwent a name change to drop the geographic distinctions, so that the whole operation would just be referred to as FedEx Freight. See id. This was not a significant event, even according to FedEx – the comprehensive corporate history on FedEx's website (including such things as a mass delivery of Harry Potter books) does not mention it. See id. Years after December 28, 2008, FedEx continued to use the terms FedEx Freight West and FedEx Freight East, as they had only ever been geographic indicators. See, e.g. Ex. 35 (six-page document dated May 23, 2011 and stamped "FedEx Freight West"); Ex. 36, at 3 (letter dated Feb. 21, 2011 and stamped "FedEx Freight East"). Finally, two key decision-makers in this case testified they have been in their same positions since before 2008: Barrett has been in his role since 2006, and McNeely has not had a change in job duties since 2007 or earlier. See Ex. 22, at 17:18-20 (Barrett); Ex. 14, at 31:20-32:1 (McNeely). Thus, the 2008 name change did not affect operations on a level pertinent to this case. See, e.g. Ex. 19, at 426:16-22.

57.     FedEx has produced no documentation in support of its purported facts in Paragraph 57; instead it relies solely on statements by Barrett. See Mot., at ¶ 57. From the standpoint of road drivers, city drivers, and even FedEx management, operations were unaffected

by a 2008 name change – the company remained the same. See Ex. 12, at 371:21-372:2; Ex. 38 (Ray Fouts Dep. Tr.), at 25:22-26:12; Ex. 19, at 426:16-22; Ex. 14, at 31:20-32:1. Further, Jeffrey Scroggins states in his Declaration for FedEx that he has been on the same Safety Review Committee for "FXFI" since 2007 – his duties were unaffected by the name change as well. See Ex. 22 to Mot., at ¶ 3 ("I sit on the Safety Review Committee as part of my duties for FXFI. I have been on the Safety Review Committee since 2007.") See also ¶ 56, supra.

58. FedEx cites no documentation in support of its purported facts in Paragraph 58; it relies only on Barrett's statement. Plaintiffs do not dispute that FedEx acquired Watkins Motor Lines in 2006, but there is no documentation that it was named "FedEx National."

59. Plaintiffs do not dispute Paragraph 59 of FedEx's Motion.

60. FedEx cites no documentation in support of its purported facts in Paragraph 60; instead, it relies only on Barrett's statements.

61. Plaintiffs identified nineteen (19) comparators, who, upon information and belief, were under age 40, had rollover accidents, and were not disqualified, among other things. See ¶ 49, supra; see also Ex. 14 to Mot. FedEx cites no documentation in support of its purported fact that four of the nineteen did not have rollovers; it relies only on Barrett's statement.

62. There was no material difference between FedEx Freight West and FedEx Freight Inc. pertinent to this case. See ¶¶ 56-57, supra. Plaintiffs and most, if not all, of the comparators were still judged by the same decision makers, McNeely and Barrett.

63. FedEx cites no documentation in support of its purported facts in Paragraph 63; instead it relies solely on statements by Barrett.

**Ryan Lee**

64.     Ryan Lee had a rollover accident on January 5, 2011, at age 32.  See Ex. 16.

65.     Lee was traveling westbound on I-80 when he received radio notice from another driver that he was heading into whiteout conditions a mile ahead, but Lee chose to continue anyway and entered the whiteout conditions at a speed of roughly 40 mph:

> I was heading westbound on I-80 in winds that were blowing 60mph +.  I was radioed by a driver about a mile ahead of me that there was possible white out conditions at top of hill (mm 262).  As I approached hill my speed was 45 mph which was 10 mph below posted speed limit. I proceeded to climb hill which **brought my speed down to 40 mph.  I was ready for the whiteout conditions at this point.**  I started to tap my break as I saw 20 feet in front of me a wall of white blowing snow.

Ex. 40 (Ryan Lee Handwritten Statement), at 1 (emphasis added).

66.     Once he was in the whiteout, Lee chose to keep driving – completely blind – a few hundred feet before he decided to try to pull off the road: "**After driving a few hundred feet with my visibility at zero, I** started to wonder if the road might turn and **started to slowly vier [sic] to the right** . . . ." Ex. 40, at 1; see also id. at 2 ("**I figured I traveled close to a quarter mile before I decided to pull over**") (emphasis added). FedEx vaguely states that Lee was traveling "at a very slow speed," but the portion of Lee's testimony it cites reflects the following:  "As I got to the top, the whiteout condition proceeded to happen, and I could not see anything, not the hood of my tractor or anything, and – so I was going approximately **20 miles an hour** at the time . . . ." Ex. 41 (Lee Dep. Tr.), at 57:21-25.

67.     Lee's visual references were not "very limited"; they were non-existent, as Lee describes.  See Ex. 40, at 1 ("after driving a few hundred feet with my **visibility at zero**"); id. ("The whiteout was so thick **I could not see the hood of my tractor**"); id. at 2 ("It was the **complete, constant blindness** of the whiteout that eventually caused me to loose [sic] my

bearings of where the road was"); Ex. 41, at 57:22-24 ("**I could not see anything, not the hood of my tractor or anything**"). Lee was not "stopping" when his vehicle rolled over. See Ex. 40, at 2 ("I'm sure by the time I rolled I wasn't going more than **15 mph**"). Unlike Plaintiffs, who each tipped only one trailer, Lee rolled over his tractor and trailer. See Ex. 22, at 252:15-17.

68. FedEx cites no documentation in support of Paragraph 68; it is a baseless statement by Barrett, who admits he did not investigate Lee's rollover. See Mot. at ¶ 68; Ex. 22, at 22:25-23:5 (no one besides McNeely investigates rollovers in the Kansas City District). And such an arbitrary measure of speed is pointless when Lee gave a metric (the only one available) for his speed: "I'm sure by the time I rolled I wasn't going more than **15 mph**." Ex. 40 at 2.

69. Even according to FedEx, Lee's accident was a result of speed and loss of control:

> Investigation of the facts as known at this point has revealed this crash to be considered driver preventable due to a **lack of situational awareness and adjustment of speed and direction to allow control of the CMV which this driver was operating**.

Ex. 7, at 3. In addition, Ryan Lee's vehicle left the roadway during his rollover accident. Ex. 22, at 92:20-93:12. **FedEx's own proffered expert** believes Lee lost control of his vehicle. See Ex. 18, at 174:14-19 ("I see leaving the roadway, which would, to me, imply loss of control" and "Leaving the roadway is loss of control, in my mind."). FedEx's own expert also believes 15 miles an hour is too fast for conditions. See Ex. 18, at 275:2-10 "15 miles an hour, is that too fast to be driving in complete blindness for a quarter mile? A. Yes."). By comparison, Hanson and Noble both experienced a rollover after they had come to a complete stop. See Ex. 42 (Hanson: "I slid sideways down the hill. I could not have been going over 10 to 15 mph. According to the tracks going in, **all axles were on the ground until the set stopped.**"); Ex. 29, at 1 (Noble: "my trailer actually fell back against the direction of the slide, after I had come to a stop."); see also

Ex. 12, at 297:19-23. But FedEx disqualified both of them on the grounds that they had a rollover where speed was a factor. Ex. 22, at 207:24-6; <u>id.</u> at 242:21-243:2.

**Hiring Data**

70. FedEx cites no documentation of the purported facts in its Paragraph 70; it relies solely on Barrett's statements. The only document FedEx produced regarding its hires is titled "Drivers Hired at DEN and GJN Service Centers Since 12/01/10 to 08/01/11," but the new hire data does not actually begin until the first entry of July 11, 2011 (over seven months after the first Plaintiff's accident). <u>See</u> Ex. 43 (Hire Spreadsheet). Even Exhibit 43 does not support the purported facts in FedEx's Paragraph 70.

71. On January 25, 2011, FedEx National LTL, Inc. merged within and into FedEx Freight, Inc. <u>See</u> Ex. 16 to Mot.

72. FedEx cites no documentation that it "hired" National drivers as part of the January 25, 2011 merger; instead, those drivers continued in their jobs without interruption. <u>See,</u> <u>e.g.</u> Ex. 12, at 374:23-375:9.

73. FedEx cites no documentation of the purported facts in its Paragraph 73; instead it relies solely on Barrett's statements. Further, the only documentation FedEx has produced relating to hires is not credible let alone reliable. <u>See</u> ¶ 70, <u>supra</u>.

74. FedEx cites no documentation of the purported facts in its Paragraph 74; it relies solely on Barrett's statements. FedEx did not produce hiring data prior to July 11, 2011 (over seven months after the first Plaintiff's accident); thus, FedEx has nothing on which to base this statement. <u>See</u> Ex. 43.

## ADDITIONAL DISPUTED FACTS

**Accident Investigations, Generally**

75. Since at least 2008, Mark McNeely has been the **only** individual who has conducted rollover accident investigations for the Kansas City District (the district in which Plaintiffs' and the comparators' accidents occurred). Ex. 22, at 22:21-23:5; Ex. 14 at 35:11-16.

76. FedEx's accident investigations are subjective – a strong indication of pretext. See § II.B.2(a), infra. FedEx admits it has no policies or procedures in place for any of the following:

    a.    What to do with the driver's statement. Ex. 14, at 43:4-10;

    b.    What to do with a police report. Id. at 46:16-19;

    c.    When to take pictures. Id. at 47:23-25;

    d.    What to do with photos, if there are any. Id. at 48:4-7;

    e.    When to talk to a police officer. Id. 232:9-11;

    f.    When to visit the scene of a rollover accident. Ex. 22, at 32:1-4;

    g.    Questions to ask about what happened in an accident. Ex. 14, at 39:10-12;

    h.    What information has to be gathered. Ex. 22, at 26:11-14; and

    i.    What documents FedEx needs to collect for an accident investigation. Id. at 26:25-27:3.

77. FedEx admits it has no procedures – express or implied – in place for how to conduct an investigation of a rollover accident:

    a.    No written policy for how to conduct an investigation of a rollover accident. Ex. 22, at 20:2-6;

    b.    No **written** defined steps for conducting an investigation of a rollover. Id. at 20:13-15; and

      c.      No **understood** steps that occur for every rollover accident investigation. <u>Id.</u> at 20:16-21.

78.     FedEx admits that accident investigation is subjective: "Q. Does the investigator have discretion how to investigate [an] accident? A. Yes." <u>Id.</u> at 21:12-14.

## Preventability Judgments, Generally

79.     For the Kansas City District, Mark McNeely makes the preliminary recommendation as to whether an accident should be judged preventable. Ex. 22, at 48:2-8.

80.     McNeely would base his preliminary recommendation on his investigation of the accident. Ex. 22, at 59:25-60:3.

81.     The other three individuals judging preventability from Arkansas, Barrett, Mark Courter, and Jay Key, typically adopt McNeely's preventability recommendation. Ex. 22, at 60:4-9. In fact, in the last five years, Barrett estimates that the group only declined to adopt McNeely's recommendation once or twice. <u>Id.</u> at 60:10-61:4.

82.     FedEx's process for judging whether an accident is preventable is also subjective. FedEx, through McNeely – the individual leading every preventability determination in the district – admits it has no polices or procedures as to any of the following:

      a.      What weather conditions to consider in judging preventability. Ex. 14, at 63:17-20;

      b.      How to consider a weather advisory in a preventability judgment. <u>Id.</u> at 77:2-5;

      c.      How to consider wind. <u>Id.</u> at 77:8-10;

      d.      How to handle white-out conditions in a preventability judgment. <u>Id.</u> at 77:13-16;

      e.      How to consider snow in a preventability judgment. <u>Id.</u> at 77:17-20;

f.	How to handle black ice in a preventability judgment.  <u>Id.</u> at 77:23-78:1;

g.	How to handle sleet in a preventability judgment.  <u>Id.</u>. at 78:11-13;

h.	How to handle rain. <u>Id.</u> at 78:14-16;

i.	How to use a police citation in a preventability judgment.  <u>Id.</u> at 76:21-24;

j.	How to handle or consider a police officer's comments in a preventability judgment.  <u>Id.</u> at 79:16-20;

k.	What a light trailer is.  <u>Id.</u> at 82:24-83:1;

l.	What is considered a heavy trailer.  <u>Id.</u> 83:4-5; and

m.	What constitutes minor damage.  <u>Id.</u> 85:9-11.

83.	FedEx admits that it has no policy or procedure whatsoever for preventability judgments: "Q. Is there some policy or procedure governing how this group of you is to decide preventability? A. No. Q. Why not?  A. I don't know." <u>Id.</u> at 103:17-23.

84.	Instead of having checklists or procedures for assessing the facts of an accident to determine whether an accident was preventable, FedEx admits that the group of individuals judging accidents just decides for themselves what to take into account each time: "Q. Who decides what's a fact and what's not?  A. All of us decide what's fact and what's not. Q. Who's all of us? A. Jay, Mark, myself, and Mark McNeely. Q. The first Mark being Mark Courter? A. Mark Courter, I apologize, yes." Ex. 22, at 221:7-14.

85.	Even if a policy existed on assessing preventability, the lead decision-maker in preventability judgments (McNeely) does not know what it is and **admits he ignores it**:

Q. So FedEx has the policy that all accidents are preventable, unless they are shown to be not preventable?
A. For the most part, yes. I don't – without seeing it I don't know verbatim what the exact policy says.
Q. What policy are you referring to?

32

A. I think it's under driver -- is it under driver, accident -- I'm not even sure of the actual name of the policy. **I don't pay attention to it.**

Ex. 14, at 56:10-22 (emphasis added).

86.     FedEx produced the "Preventability File" for each of 159 drivers. <u>See</u> Ex. 48 (FedEx's Chart of Comparators). But Barrett (one of four judging preventability) does not know:

    a.      what a Preventability File is, without looking at one.  Ex. 22, at 158:9-21;

    b.      what the purpose of a Preventability File is.  <u>Id.</u> at 159:12-15;

    c.      what is contained in a Preventability File.  <u>Id.</u> at 159:16-20; or

    d.      how Preventability Files are used.  <u>Id.</u> at 160:9-11.

**<u>Disqualification Decisions, Generally</u>**

87.     The Safety Review Committee's process for deciding whether to disqualify a driver is subjective. FedEx admits it has no policies or procedures as to the following:

    a.      What documents must be considered during a driver's safety review. Ex. 22, at 142:11-13;

    b.      When the driver's accident history will lead to disqualification. <u>Id.</u>, at 108:13-18;

    c.      How much weight to attach to one rollover accident versus the rest of a driver's driver safety review sheet [or driving history]. <u>Id.</u>, at 114:14-19;

    d.      Explaining what is required before a driver can return to service (if the driver is not disqualified). Ex. 14, at 246:6-9; and

    e.      Calling for automatic disqualification if it is determined that speed is a factor in the rollover accident.  Ex. 22, at 222:21-223:8.

88.     FedEx admits that it has no polices or procedures in place regarding the how driver safety reviews are conducted and/or documented:

      a.     No policy or procedure saying that one member of the Safety Review Committee has to refrain from voting in a disqualification decision.  Ex. 22, at 104:23-105:3;

      b.     No policy or procedure as to what documents go into a driver's disqualification file.  Id. at 156:23-157:1;

      c.     No policy or procedure as to what documents go into a driver's safety review file.  Id. at 157:2-4;

**Charles Bush**

89.    FedEx admits that it knew, at the time it judged Bush's accident preventable, that his brakes had been out of adjustment at the time of his accident.  Ex. 22, at 173:4-7.

90.    FedEx admits that it knew, at the time it disqualified Bush (at age 61) from driving, that his brakes had been out of adjustment at the time of his accident.  Ex. 22, at 173:11.

91.    Driver Rob Green (age 34) had a rollover accident in late May, 2010 that he said was caused by malfunctioning brakes.  See Ex. 50 (Email String).

92.    The Fleet Maintenance Manager ran detailed checks on Green's brakes, including computer checks, and informed McNeely that "everything checks out correct" and the brakes service canister "would not cause the brakes to lock up."  Id. at 2-3.

93.    In spite of the information that "we didn't find any defect with the brakes," and "there is no explanation as to why this could have happened," McNeely asked Barrett: "Can I go ahead and judge this NP [non-preventable]?"  Id. at 1, 2. Barrett responded, "Yes, go ahead."  Id. at 1. The accident was judged non-preventable. Id.; see also Ex. 16, at 4 (judged NP).

94.    Before there was even a judgment on preventability, however, Barrett had already returned Green to service.  See id. at 1.

95.     Drivers receive a safety award for each year they go without accident or incident, such as dropping a trailer, breaking an air line, or backing into a pole. Ex. 41, at 35:16-36:14.

96.     Bush earned several awards, including three consecutive safety awards. See Ex. 1.

97.     Lee (almost 30 years younger than Bush), earned six consecutive safety awards, even though he admits that during those six years he had at least one accident – one for which he received a citation and which FedEx judged preventable – but he received an award anyway. See Ex. 41, at 36:15-25.

98.     FedEx admits that there was no written policy under which Bush's disqualification was appropriate.  See Ex. 22, at 176:3-17.

99.     In 42 years of commercial driving, Bush had never tipped over a trailer until his accident on December 21, 2010. See Ex. 32, at 2.

**John Noble**

100.     FedEx knew, at the time it judged Noble's accident "preventable," that the roads were icy at the time and location of Noble's accident.  Ex. 22, at 237:1-8.

101.     In fact, FedEx had difficulty finding anyone to go to the scene of the accident because of the "slick road conditions" and "bad weather conditions" – "nobody want[ed] to venture out." See Ex. 47 (December 7, 2010 Emails), at pp. 2-3; Ex. 22, at 236:13-25.

102.     Noble (age 49) was traveling more than 25 mph **under** the speed limit, when he encountered black ice and wind, pushing him into the median. See Ex. 33, at 2; Ex. 16, at 2.

103.     Noble continued to make slight adjustments and kept his tractor in front of both trailers until he came to a stop in the median.  See Ex. 33, at 2; Ex. 29, at 1.  The median sloped

toward the center, and his back trailer tipped because of the slope, **after Noble had come to a complete stop**.  See Ex. 33, at 2; Ex. 29, at 1.

104.    Driver Cory Halling (age 34) was traveling at the speed limit (60 mph) in clear and dry conditions, at the time of his rollover accident, which he said was a result of high winds. See Ex. 51 (Halling Preventability File), at 20 (birth date), 18 (speed), and 10 (conditions).

105.    The weather data in Halling's Preventability File indicates that wind speeds were 8.1 mph around the time of his accident.  Id., at 14 (entry for 5:15 a.m.).

106.    There is no weather data in Noble's Preventability File.  See Ex. 60 (Noble Preventability File).

107.    FedEx also considered the damage done to the trailer in disqualifying Noble. 247:11-19. But the estimated dollar amount of damage is identical for Noble's and Halling's accidents.  See Ex. 52 (Comparing Noble's and Halling's Driver Safety Review sheets).

108.    Halling was returned to driving; Noble was disqualified.  See Ex. 51, at 1; Ex. 4.

109.    The reason FedEx gives for disqualifying Noble is that "speed was a determining factor in the rollover."  Ex. 22, at 247:18-19; id. at 242:21-243:7.

**Mark Hanson**

110.    The President's Safety Team consists of "drivers who have driven 10 consecutive years without a preventable accident."  Ex. 22, at 205:22-206:19.  FedEx describes this as "quite an accomplishment," and "an achievement," and stated that Hanson had an "outstanding safety record."  Id.; see also Ex. 49 (Hanson Awards), at 13.

111.    Hanson was named a member of the President's Safety Team on January 1, 2011, just three weeks before his disqualification.  Ex. 22, 205:7-207:23; see also Ex. 49, at 13.

112.     Hanson's President's Safety Team Award was not even mentioned during driver safety review.  Ex. 22, at 206:20-24.

113.     Lee had **four** accidents deemed "preventable" (under the company's standards) in the five years prior to his accident.  Ex. 22, 253:8-16.

114.     Prior to starting his trip, Hanson asked the dispatcher named Frank if he could take I-70 instead of I-80 because the weather was so bad on I-80.  Ex. 21, at 123:7-15.  Hanson's request was denied; he was forced to drive on I-80.  Id. at 123:16-25.

115.     Lee's accident occurred within 4.5 months of Grimlsey's accident, within 1 month of Noble's accident, within 15 days of Bush's accident, and within 13 days of Hanson's accident. See Ex. 16, at 2 and 3. Two Plaintiffs' accidents occurred prior to Lee's accident, and the other two occurred after.  See id.

116.     Hanson's last estimate of speed before his accident was:  "I could not have been going over 10 to 15 mph."  Ex. 42, at 2.

117.     Lee's last estimate of speed before his accident was:  "I'm sure by the time I rolled I wasn't going more than 15 mph."  Ex. 40, at 2.

118.     The reason FedEx gives for disqualifying Hanson is that "he had a rollover accident where it was determined that speed was the cause of the rollover." Ex. 22, at 208:15-20.

119.     The reason FedEx gives for **not** disqualifying Lee is "because it was determined that speed was not an issue in the cause of the rollover."  Ex. 22, at 254:10-12.

120.     Hanson was age 51 at the time of his accident; Lee was age 32. See Ex. 16, at 2-3.

121.     Barrett does not know whether there was a written policy under which Hanson's disqualification was appropriate.  Ex. 22, at 197:12-25.

122.     In April of 2011, undersigned counsel sent a letter on Hanson's behalf to FedEx, complaining of age discrimination. <u>See</u> Ex. 44, at 122:7-11; <u>see also</u> Ex. 21, at 203:12-16.

123.     Three days later, on April 28, Hanson and Villanueva spoke on the phone. Villanueva admits to telling Hanson in that call that he "heard [Hanson] had involved lawyers," and he wanted to know if Hanson was going to resign or if he [Villanueva] had to terminate Hanson. <u>See</u> Ex. 44, at 96:11-22; 91:5-9.

124.     Hanson said he would not resign; he wanted to continue working at FedEx. <u>See</u> Ex. 21, at 212:18-213:4. Villanueva then terminated Hanson's employment. <u>See id.</u>

**Brad Grimsley**

125.     Road conditions were very slick (snow and ice) at the time of Grimsley's accident. <u>See</u> Ex. 35, at 4.

126.     Seeing a car ahead that had come into his lane going 5 mph or less, Grimsley went to make a lane change rather than risk hitting the car. <u>See</u> Ex. 35, at 4.

127.     FedEx admits that it was not even considered that Grimsley took action specifically **to avoid** an accident. <u>See</u> Ex. 22, at 221:15-17.

128.     Even if FedEx accepted that Grimsley had taken action specifically to avoid an accident, that still "probably wouldn't have changed the judgment." Ex. 22, at 221:18-23.

129.     Marquez (age 31) was also driving on icy roads when he "turned toward the shoulder (passenger side) **to avoid hitting vehicles**" and his trailer tipped over. Ex. 63 (Marquez Statement), at 1 (emphasis added).

130.     Marquez was traveling at 27 mph **under** the speed limit at the time of his accident; Grimsley was traveling at least 35 mph **under** the speed limit at the time of his accident.  See Ex. 62 (Marquez Statement), at 1; cf. Ex. 28, at 44.

131.     Marquez (age 31) was not disqualified; Grimsley (age 45) was. See Ex. 16 at 6, 3.

132.     Barrett does not know that there was a written policy under which Grimsley's disqualification was appropriate.  Ex. 22 at 223:21-25.

133.     Before his accident in May, 2011, Grimsley had a completely clean driving record, with zero incidents of any kind.  See Ex. 22 at 226:6-18.

134.     FedEx admits that Grimsley's accident, investigation, preventability judgment, and driver safety review (in which he was disqualified) all occurred within one day, and that this is unusually fast timing.  See Ex. 22, at 229:7-19.

135.     When asked about the fast timing, Barrett said: "**it felt like** we had enough to judge it preventable."  Ex. 22, at 229:20-230:4 (emphasis added).

136.     Barrett describes Grimsley's disqualification as follows: "we knew we were meeting as a review, and **took him down**."  Ex. 22, at 229:20-230:4 (emphasis added).

137.     On June 17, 2011, undersigned counsel complained to FedEx of age discrimination on behalf of Grimsley. See Ex. 20, at 240:13-19.

138.     Grimsley was informed **the next business day**, June 20, 2011, that his employment at FedEx was being terminated.  See Ex. 20 at 137:9-138:4.

**FedEx's Treatment of Younger Employees / Comparators**

139.     Ryan Lee was 32 years old at the time of his accident. See Ex. 16, at 2.

140.     Lee was radioed by a driver a mile ahead that there were whiteout conditions

coming up.  See Ex. 40, at 1.

141.    The driver ahead of Lee was Shane Kotlewski, who stated that Lee shouldn't have been following him that fast.  See Ex. 55, at 99:8-14.

142.    Lee admits he entered the whiteout conditions going 40 mph. See Ex. 40, at 1.

143.    Lee admits he drove downhill, at a 4% to 6% grade, for a few hundred feet with his visibility at zero.  Id. at 1.  Only then did he attempt to pull over.  Id. at 1; see also id. at 2 ("I figured I traveled close to a quarter mile before I decided to pull over").

144.    Lee stated: "it was the complete, constant blindness of the whiteout that eventually caused me to loose [sic] my bearings of where the road was."  Id. at 2.

145.    Lee rolled his tractor and front trailer.  Id. at 2.

146.    Lee was cited for failure to use extreme caution.  Id. at 2; Ex. 58 (Lee citation).

147.    Lee was allowed to drive again within days of his accident.  See Ex. 7, at 1.

148.    According to FedEx, speed **was** a factor in Lee's rollover:  "Investigation of the facts as known at this point has revealed this crash to be considered driver preventable due to a **lack of situational awareness and adjustment of speed** . . . ."  Ex. 7, at 3 (emphasis added).

149.    But the reason FedEx gives for not disqualifying Lee is: "because it was determined that speed was not an issue in the cause of the rollover."  Ex. 22, at 254:10-12.

150.    Cory Halling was 34 years old at the time of his accident.  See  Ex. 16, at 2.

151.    He was going 60 mph (the speed limit) when his rollover occurred. Ex. 51 at 18.

152.    The road conditions at the time of his accident were dry and clear; Halling stated that the cause of his accident was high winds.  See id. at 10, 18.

153.    Halling stated that while his accident was ensuing, he "had no control." Id. at 19.

154.     Weather data from two locations is in Halling's Preventability File.  Id. at 13-14.

155.     There is no weather data in the Preventability File for any of Plaintiffs, even though adverse weather conditions existed during all four of their accidents.  See Ex. 59 (Bush); Ex. 60 (Noble); Ex. 61 (Grimsley); Ex. 62 (Hanson).

156.     Mark Courter, one of the four individuals judging preventability (along with McNeely and Barrett) stated as to Halling's accident: "It looks like the wind and wind gusts have actually calmed down from earlier readings in the region and there are no thunderstorms showing on radar."  Id. at 14. Courter even suspected: "Do you suppose inattention or fatigue was more of a contributing factor than the wind in his rolling his trailer in the ditch?"  Id.

157.     Halling was not disqualified; he was back to driving within four days.  Id. at 1.

158.     James Marquez was 31 years old at the time of his accident.  See Ex. 16, at 6.

159.     Marquez was traveling on icy roads, when, as he states, he "turned toward the shoulder (passenger side) **to avoid hitting vehicles**. The rear trailer flipped when [he] was pulling to the shoulder."  Ex. 63, at 1 (emphasis added).

160.     According to McNeely, Marquez "should have anticipated that there were going to be some icy spots."  Ex. 64 (McNeely Email).

161.     Marquez's accident occurred in Denver.  See Ex. 9, at 5. McNeely, who works in Kansas City (590 mi. away), went to the scene of Marquez's accident. Ex. 14, at 101:18; Ex. 64.

162.     McNeely did not go to the scene of any of Plaintiffs' accidents.  See Ex. 14, at 116:10-11 (Bush); 139:24-140:1 (Grimsley); 167:1-2 (Hanson); 186:1-2 (Noble).

163.     Marquez was not disqualified; he was back to driving in six days. See Ex. 9, at 1.

164.     Robert Green was 34 years old at the time of his accident. See Ex. 16, at 4.

165.     Green was travelling at 60-65 mph at the time of his accident, which, he believed, was a result of a mechanical problem with the brakes. See Ex. 65 (Green Statement).

166.     The Fleet Maintenance Manager ran checks on the brakes, and concluded: "There is no explanation as to why this could have happened since everything checks out correct." Ex. 50, at 2. He also said, "the fitting on the left (driver side) brake service can is broken off but . . . it **would not cause the brakes to lock up**. Another question we have is this. From what we understand the road conditions were dry and clear. If the brakes on the rear box did lock up how would that cause the trailer to swing out?" Id. at 2 (emphasis added).

167.     **Barrett returned Green to service as a driver before the accident was even judged for preventability**. Id. at 1.

168.     In spite of the Fleet Maintenance Manager's conclusions, McNeely asked Barrett if he could go ahead and judge the accident non-preventable. Id. at 1. Barrett said yes, and the accident was judged non-preventable. Id. at 1; Ex. 16, at 4.

169.     Matthew Schafer was 23 at the time of his first rollover accident. See Ex. 16, at 6.

170.     He was driving 35 mph on "slick roads" when his rear trailer tipped over and hit a guard rail, blocking traffic on Westbound I-80. See Ex. 66 (Schafer Statement), at 1; Ex. 67 (Schafer Electronic Event), at 1. Schafer was only an apprentice driver at the time. Ex. 67, at 1.

171.      Schafer was not disqualified; he was driving again in 5 days. See Ex. 68 (Email).

## FedEx's Treatment of Employees Over Age 40

172.     Glen Vance (age 60) had an accident on May 22, 2012, which McNeely judged "preventable" in spite of several witness statements saying there was nothing he could have possibly done to avoid it. Ex. 45, at ¶ 4.

173.     Barrett disqualified Vance, purportedly "because of the other little accidents on your record"; but Vance did not have any moving violations in twenty years of driving and the few things on his record were extremely minor.  Ex. 45, at ¶ 5.

174.     Vance testified that the real reason he was disqualified was his age.  Ex. 45, at ¶ 6.

175.     Vance has retained counsel and initiated legal proceedings against FedEx on the basis of age discrimination.  See Ex. 56 (Vance, Kansas Human Rights Commission Complaint).

176.     Ray Fouts (age 66) was told his retirement package was being revoked after he had an accident.  See Ex. 38, at 60:12-14.

177.     Fouts brought an age discrimination claim against FedEx in the EEOC.  See Ex. 38, at 16:11-17:21.  FedEx and Fouts reached a monetary settlement of Fouts' age discrimination claims.  Id. at 18:1-10.

178.     Thomas Dixon was 63 at the time of his rollover accident. Ex. 11. He had just received a 10-year safe driving award two months earlier.  Id. at ¶ 5.

179.     Dixon's accident was not preventable – he had a witness statement on his behalf and received no ticket.  Id. at ¶ 4.

180.     Within months of Dixon's accident, another driver at least twenty years younger had a very similar accident in the same exact intersection.  Id. at ¶ 7. That driver was not disqualified; instead, he was back to driving within five days.  Id. at ¶ 8.

181.     Mario Abeyta (age 63) had a minor accident toward the end of his career, in which he was driving 4 mph, making a left turn on icy roads, and his trailer slid into the dip of the road's storm drain, only slightly denting it.  See Ex. 53, at ¶ 6. Abeyta's accident was judged

"preventable," even though his co-worker, who witnessed the accident, wrote a letter on Abeyta's behalf, explaining that the accident was not preventable. See id.

182. Abeyta is aware of a younger driver (under age 40) who had three accidents in 2009, two of which were rollovers. See id., at ¶ 4. That driver was never disqualified. See id.

183. William Ray Hillis (age 59) was disqualified after a rollover, unlike his younger counterparts, and he filed a lawsuit claiming age discrimination against FedEx Freight Inc. in this Court on July 2, 2012. See Ex. 57 (Hillis Complaint). FedEx settled that lawsuit. See Ex. 12, at 385:17-386:2 (statements by FedEx's counsel, also FedEx's counsel in the Hillis matter).

184. FedEx wants to get rid of its older drivers, as expressed by both current and former employees of the company:

a. "FedEx wants to have a fleet of younger drivers. FedEx wants to get rid of people like me – older drivers – and I have seen them do it several times, even since late 2010." Ex. 11, at ¶ 12.

b. "It is widely known that FedEx is trying to get younger drivers. FedEx has a waiting list of young guys wanting to drive for them, and those young drivers cost less in insurance. A Road Driver from West Memphis, Arkansas . . . even told me that his supervisor commented to him, "FedEx as a whole is getting rid of its older drivers because of costs. They'll just replace them with younger drivers." Ex. 45, at ¶ 6.

c. "In addition, on numerous occasions, I heard FedEx managers state with respect to older drivers, including Mr. Bush, 'We'll just replace you with a younger guy.' That mentality was widely known at FedEx." Ex. 54 (Walden Cox Aff.), at ¶ 6; see also Ex. 55 (Walden Cox Dep. Tr.), at 97:4-11; Ex 19, at 232:6-233:16 (Cox told Bush what he heard).

    d.  "I don't suspect. I actually would hear those comments that, we can get rid of the older drivers, we could push the older drivers out, we could replace them with the younger drivers, they – we don't have to pay them as much, comments like that." Ex. 12, at 148:21-149:2.

    e.  "I was aware of several younger drivers at FedEx who were treated more favorably than older drivers." Ex. 53 (Mario Abeyta Aff.), at ¶ 3. "I retired from FedEx because of the favoritism FedEx shows younger drivers." <u>Id.</u> at ¶ 8.

**Additional Age Related Comments**

  185.  Norm Villanueva ("Villanueva"), Operations Manager, testified that he personally calls Bush "old man" and "old fart." <u>See</u> Ex. 44 (Villanueva Dep. Tr.), at 16:19-20; <u>id.</u> at 75:13-76:23; <u>id.</u> at 74:23-75:24; <u>see also</u> Ex. 19, at 220:16-221:6; <u>id.</u> at 222:12-223:7.

  186.  Villanueva has also heard several younger employees call Bush "grandpa." <u>See</u> Ex. 44, at 76:11-24.

  187.  Villanveva does not believe the terms "old man," "old fart," or "grandpa" are appropriate comments in the workplace; in fact, he believes that if a manager hears inappropriate comments being made around employees, his own approach as a manager would be to bring the offenders into his office and address it immediately. <u>See</u> Ex. 44, at 79:14-80:5; <u>id.</u> at 81:12-3.

  188.  Nonetheless, Villanveva has never addressed inappropriate age-related comments with his employees. <u>See</u> Ex. 44, at 82:4-25.

  189.  Villanveva does not believe that, even if Bush has a colorful personality, this excuses comments being made to him about his age. <u>See</u> <u>id.</u> at 117:12-17.

  190.  Bush has also been called "old bastard" and "old cocksucker," in addition to the other names. Ex. 19, at 71:3-14.

191.    Glen Vance, who drove for FedEx for almost 21 years but was disqualified at age 60, heard age-related comments all the time at FedEx, within earshot of management. <u>See generally</u> Ex. 45 (Declaration of Glen Vance). He has never seen management do anything about age-related comments. <u>Id.</u> at ¶ 9.

192.    Hanson also heard age-related comments repeatedly – comments such as "can you handle this as being an older person." Ex. 21, at 110:12-19; <u>id.</u> at 111:2-4.

193.    Hanson heard employees call Bush "old fart" and "old fucker." <u>Id.</u> at 336:15-25.

194.    Noble heard age-related comments daily, such as "we can get rid of the old guys and just replace them with newer – younger drivers at a cheaper rate." Ex. 12, at 145:13-146:8.

195.    Noble heard these comments (see Paragraph 195, above) from managers and supervisors, including individuals named Brett, Wade, and Rick. <u>See</u> Ex. 12, at 147:13-150:18.

196.    Dixon, who drove for FedEx for 17 years before he was disqualified at 63, stated:

> In addition, when I worked at FedEx, I heard age-related comments all the time. Older employees (including me) were called "grandpa" and "old man." Younger drivers would ask me, "when are you going to retire so I can move up?" and "how much longer are you going to stay working here?" I am not aware of FedEx, or any FedEx manager ever doing anything about these age-related comments and questions."

Ex. 11, at ¶ 11.

197.    FedEx has no measures in place to prohibit age discrimination – as Liberty Morris, Human Resources Supervisor at corporate headquarters, who has worked at FedEx for thirteen years, testified:

> Q. What is FedEx's equal employment opportunity policy? ...
> A. I'm not familiar with it.
> Q. What is FedEx's position on age discrimination? …
> A. There's not one.
> Q. Does FedEx have a position on retaliation? …

A. No.
Q. Does FedEx have a policy on retaliation? …
A. Not that I'm aware of, no.
Q. Does FedEx have a policy on age discrimination?
A. Not that I'm aware of, no.
…
Q. Is there any kind of policy on what a manager should do if they hear any discriminatory comments?
A. Not that I'm aware of. I don't know.
Q. Do drivers receive training?
A. I'm not for sure on that either.
Q. Does HR do training of employees?
A. Only the employees that are hired into human resources.
Q. So HR doesn't go out to the rest of the company and do trainings on policies?
A. No.

Ex. 46 (Morris Dep. Tr.), at 22:14-23:7; 24:10-20; 8:11-12.

198.    FedEx managers are not trained to prevent or handle discrimination – as manager Villanueva testified: "So is the universe of training that you received reading the HR procedures on EEO in the FedEx handbook? A. I believe so." Ex. 44, at 32:14-17.

## ARGUMENT

## I.    LEGAL STANDARD.

"Summary judgment is only appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting Fed. R. Civ. P. 56(c)). Applying this standard, "the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Rost ex rel. Rost v. Atkinson, --F.Supp.2d--, 2013 WL 1151622, at *2 (D. Colo. Mar. 20, 2013) (citing Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir.

2000)). "All doubts must be resolved in favor of the existence of triable issues of fact." Id. (citing Boren v. Southwestern Bell Telephone Co., 933 F.2d 891, 892 (10th Cir. 1991)).

"[A]ffidavits are not a substitute for trial and summary judgment is improper where an issue turns on credibility." Rivera v. Union Pacific R.R. Co., 868 F.Supp. 294, 297 (D. Colo. 1994) (quoting Nat'l Aviation Underwriters v. Altus Flying, 555 F.2d 778, 784 (10th Cir. 1977)). "It is particularly wrong to base a summary judgment on the deposition of an interested party on facts known only to him—a situation where demeanor evidence might serve as real evidence to persuade a trier of fact to reject his testimony." Id. (quoting Nat'l Aviation, 555 F.2d at 784).

## II.  PLAINTIFFS CAN ESTABLISH AGE DISCRIMINATION.

A Plaintiff may establish age discrimination using either "direct evidence of the employer's discriminatory intent" or "circumstantial evidence creating an inference of a discriminatory intent using the tripartite *McDonnell Douglas* burden-shifting analysis." Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1114 (10th Cir. 2007). Here, Plaintiffs can establish both.

### A.  Direct Evidence

FedEx employees and managers have openly made discriminatory, age-related statements toward the Plaintiffs and other older drivers. See ¶¶ 185-197, supra. Manager Villanveva testified that he personally has called Bush names, including "old man" and "old fart." See ¶ 185, supra. Glen Vance and Thomas Dixon both heard age-related comments "all the time" within earshot of management, such as "old man" and "grandpa," and neither saw management do anything about it. See ¶¶ 192, 197, supra; Ex. 45; Ex. 11. Dixon was also questioned, "when are you going to retire so I can move up?" and "how much longer are you going to stay working here?" See ¶ 192, supra; Ex. 11, at ¶ 11. Walden Cox heard managers state multiple times, with

respect to older drivers including Bush, "We'll just replace you with a younger guy." See ¶ 183(c), supra; Ex. 54, at ¶ 6. Noble likewise heard managers and supervisors, including three individuals named Brett, Wade, and Rick, regularly say, "we can get rid of the old guys and just replace them with newer–younger drivers at a cheaper rate." See ¶194-95, supra. Bush (a current employee) and Hanson also testified that they heard, and were the subject of, age-related comments (particularly malicious). See ¶¶ 185, 190, 192, 193, 194, supra. Thus, at least **seven witnesses**, including a manager (a FedEx witness), heard discriminatory age-related comments made toward Plaintiffs and other older drivers. This is unquestionably a case for the jury.

There is also ample evidence that it was widely known and routinely **stated** that FedEx was trying to get rid of older drivers and bring in younger, cheaper drivers. See ¶¶ 184(a-e). Where Plaintiffs, third-party witnesses, and even a FedEx manager have testified to derogatory, age-related comments, Plaintiffs have established "direct evidence of the employer's discriminatory intent." See Riggs, 497 F.3d at 1114. Summary judgment is therefore inappropriate. See Riffel v. Okla. Gas and Elec. Co., 141 F.3d 1185 (Table), at *2 (10th Cir. Mar. 31, 1998) ("some direct evidence of age discrimination . . . precludes summary judgment").

**B.    Circumstantial Evidence**

The Court should deny summary judgment on the separate, independent grounds that Plaintiffs can establish age discrimination with circumstantial evidence. See Riggs, 497 F.3d at 1114. Establishing ADEA discrimination by circumstantial evidence is governed by the three-step burden shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, Plaintiffs must establish a *prima facie* case of discrimination by showing they: (1) were within the protected class; (2) were qualified for their positions; (3) suffered

adverse employment actions; and (4) were treated less favorably than those not in the protected class. See, e.g. Estes v. Vilsack, 2012 WL 4466549, *6 (D. Colo. Sept. 27, 2012) (citing Sanchez v. Denver Pub. Schs., 164 F.3d 527, 531 (10th Cir. 1998)). The *prima facie* hurdle is "not an onerous one." Paup v. Gear Products, Inc., 327 Fed. Appx. 100, 109 (10th Cir. 2009) (quoting Orr v. City of Albuquerque, 417 F.3d 1144 (10th Cir. 2006)). Once a *prima facie* case is established, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decisions. Id. at 110. The burden then shifts back to the employee to provide evidence that a reasonable jury could use to determine that the employer's reason was pretextual. Id. at 111.

1.     Plaintiffs Can Establish A *Prima Facie* Case of Age Discrimination.

Plaintiffs can establish all four elements of a *prima facie* case of age discrimination. See, e.g. Estes, 2012 WL 4466549 at *6 (citing Sanchez, 164 F.3d at 531). First, Plaintiffs are all members of the protected class because they are over age 40. See 29 U.S.C. § 631(a). Second, Plaintiffs performed their jobs well at all times, and they were—and still are—qualified for their positions as drivers. They received numerous safety awards and distinctions throughout their combined thirty-six plus years of driving for FedEx. Bush received: a nomination for an Easy To Do Business With ("EZTDBW") Award and prize; three Safety Awards (three consecutive years); and a Service Award for five years. See Ex. 1. Mr. Noble is likewise an exemplary driver, having driven safely and professionally for FedEx entities for over twenty years prior to his accident. See, Ex. 52, at 1; Ex. 12, at 14:11-15:17. Mr. Grimsley also drove completely accident-free for roughly eleven years before his only accident. See Ex. 20, at 19:3-23; Ex. 22, at 226:6-9. He received a Safety Award. See Ex. 69 (Grimsley Award). Finally, Hanson still wears a leather FedEx jacket, a gift from FedEx for safe driving. He received numerous recognitions: seven

consecutive Safe Driving awards; Employee of the Month; Employee of the Quarter; several EZTDBW Certificates; the Service Award for ten years; and he was named a President's Safety Team Member, in recognition of his "outstanding safety record," presented by the CEO weeks before he was disqualified. See Ex. 49.

Third, Plaintiffs each suffered multiple adverse employment actions. FedEx judged their accidents "preventable" with no explanation. See Ex. 70 (Form letters to Plaintiffs). FedEx disqualified them from driving for three years with no explanation. See Ex. 36 (form letters); see also Exs. 3, at 1; 4, at 1; 5, at 1; and 6, at 1. FedEx failed and/or refused to properly consider the facts of their accidents on appeal. See Ex. 36 (form letters); see also ¶ 46, supra; Ex. 29 (appeal was "rubber stamped" and "the facts were never really considered"). FedEx demoted Plaintiffs to dock workers. See Ex. 41, at 143:12-144:16; Ex. 20, at 176:22-177:2. FedEx drastically reduced Plaintiffs' compensation. See, e.g. Ex. 71 (Hanson's pay stubs before and after accident, reducing hourly rate); see also Ex. 19, at 75:2-15 (drivers get hourly rate plus mileage); Ex. 12, at 132:13-24, 143:22-144:14. FedEx removed their benefits. See, e.g. Ex. 71, at 11; cf. id. at 12; Ex. 19, at 75:10-76:3; Ex. 12, at 132:13-24, 143:22-144:14. FedEx placed them in loading dock positions where they have been required to perform manual labor. See Ex. 19, at 72:21-73:12; Ex. 41, at 143:23-144:3; Ex. 12, at 143:22-144:14. FedEx reduced Plaintiffs' work hours (except Bush). See Ex. 12, at 132:13-24; Ex. 21, at 316:7-13; Ex. 20, at 129:4-14.

Forcing Plaintiffs into the dock worker positions constituted constructive discharge. FedEx knew that, where dock work is both financially devastating and physically demanding (especially for Plaintiffs and other older employees), it is only a matter of time before drivers sent to the dock are forced out. See Ex. 38, at 51:24-52 (Fouts: "I know very well what it takes to

work the dock. And it's a lot of lifting. … at my age [66], I was not about to take on that."); Ex. 12, at 203:4-205:17 (Noble: dock work was "really affecting my health as far as my knees were going, and the weather, being as cold as it was, was really causing me some severe problems.").

Fourth, Plaintiffs were treated much less favorably than their younger counterparts. Plaintiffs are aware of multiple drivers who were under age 40 and had similar accidents (some worse), and who were not disqualified as drivers, but were allowed to keep driving, and keep their pay, benefits, and hours. Ryan Lee was involved in a rollover on January 5, 2011 (within weeks of the first three Plaintiffs' accidents) during winter conditions. Lee received a radio message warning him about an upcoming whiteout. Lee chose to drive into it anyway, and after he drove a quarter of a mile "with [his] visibility at zero," he left the roadway, and his tractor and front trailer flipped. Lee was cited. FedEx did not disqualify Lee and he was returned to duty, nor did he suffer a reduction in pay, benefits, or hours. Lee was 32. See ¶¶ 139-149, supra.

Robert Green had a rollover that he claimed was caused by bad brakes – similar to Bush. Green was driving at 60-65 mph at the time of his accident; by contrast, Bush was going 35 mph. The Maintenance Manager checked the brakes on the trailer and found that there were no problems with the brakes. Yet the same decision-makers who decided Bush's accident was "preventable" (McNeely and Barrett) decided Green's accident was "non-preventable." See Ex. 8. Barrett even returned Green to driving **before his accident was judged for preventability.** See Ex. 50, at 1. Green did not suffer a reduction in pay, benefits, or hours, nor was he put on the loading dock for manual labor. He was 34. See ¶¶ 164-168, supra.

Cory Halling was going 60 mph at the time of his accident, which he said was caused by wind. FedEx gathered weather data for two locations near his accident, data appearing in his

Preventability File. None of Plaintiffs' Preventability Files contains weather data. FedEx noticed the wind had calmed down by the time of Halling's accident, and it might have been due to "inattention or fatigue." He was not disqualified; he was driving within four days. He did not see a cut in pay, benefits, or hours, nor was he put on the dock. He was 34. See ¶¶ 150-157, supra.

Marquez was traveling on an icy stretch when he maneuvered toward the shoulder "to avoid hitting vehicles" and flipped his trailer. Grimsley also maneuvered to avoid hitting a vehicle while driving on ice. FedEx did not disqualify Marquez, nor did he suffer a cut in pay, benefits, or hours, nor was he put on the loading dock. Marquez was 31. See ¶¶ 158-163, supra.

Thus, Plaintiffs establish a *prima facie* case. See Estes, 2012 WL 4466549 at *6.

      2.      The Proffered Legitimate Reasons for Plaintiffs' Treatment Are Pretext.

Once a *prima facie* case is established, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decisions, then it shifts back to the employee to show pretext. Paup, 327 Fed. Appx. at 110-11. Even if FedEx can provide a reason sufficient to meet its burden, Plaintiffs can show that FedEx's proffered explanation is pretext: FedEx's decisions were entirely subjective, and the three-part explanation FedEx offers is inherently implausible.

      a.      FedEx's Decisions Are All Made Subjectively.

Evidence of pretext may include "the use of subjective criteria." Id. (quoting Simms v. Oklahoma ex re. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999)).  By its own admissions, FedEx's decision-making processes at every level – accident investigation, preventability determination, and disqualification – are subjective.

      i.      FedEx's Accident Investigations Are Subjective.

FedEx's accident investigations are subjective - it admits it has **no** policies in place for:

what to do with the driver's statement (Ex. 14, at 43:4-10); what to do with a police report (id. at 46:16-19); when to take pictures (id. at 47:23-25); what to do with photos, if any (id. at 48:4-7); when to talk to a police officer (id. 232:9-11); when to visit the scene (Ex. 22, at 32:1-4); what questions to ask about what happened (Ex. 14, at 39:10-12); what information has to be gathered (Ex. 22, at 26:11-14); or what documents FedEx needs to collect (id. at 26:25-27:3). See also, ¶ 75-76, supra. Further, FedEx admits it has **no** procedures for how to conduct an investigation (Ex. 22, at 20:2-6); no **written** defined steps for conducting an investigation (id. at 20:13-15); and no **understood** steps that occur for every rollover investigation (id. at 20:16-21). See also, ¶ 77, supra. Finally, **FedEx admits that accident investigation is subjective**: "Does the investigator have discretion how to investigate [an] accident? A. Yes." (Id. at 21:12-14).

ii.     Preventability Judgments Are Subjective.

FedEx's "process" for judging accidents (deciding whether an accident was preventable) is also entirely subjective. FedEx admits it has no policies or procedures on any of the following: what weather conditions to consider (Ex. 14, at 63:17-20); how to consider a weather advisory in a preventability judgment (id. at 77:2-5); how to consider wind (id. at 77:8-10); how to handle white-out conditions (id. at 77:13-16); how to consider snow (id. at 77:17-20); how to handle black ice in a preventability judgment (id. at 77:23-78:1); how to handle sleet in a preventability judgment (id.. at 78:11-13); how to handle rain (id. at 78:14-16); how to use a police citation (id. at 76:21-24); how to consider police officers' comments (id. at 79:16-20); what a light trailer is (id. at 82:24-83:1); what is considered a heavy trailer (id. 83:4-5); or what constitutes minor damage (id. 85:9-11). See also ¶¶ 82, supra. In fact, FedEx admits that it has no policy or procedure whatsoever for preventability judgments: "Q. Is there some policy or procedure

governing how this group of you is to decide preventability? A. No." Ex. 14, at 103:17-23; <u>see also</u> ¶ 83, <u>supra</u>. Instead of having criteria for assessing an accident, FedEx admits that those judging accidents just decide for themselves what to take into account: "Q. Who decides what's a fact and what's not? A. All of us decide what's fact and what's not." Ex. 22, at 221:7-14. Further, if there is a policy, the lead preventability judge (McNeely) **admits he ignores it**: "Q. So FedEx has the policy that all accidents are preventable, unless they are shown to be not preventable? A. For the most part, yes. I don't – without seeing it I don't know verbatim what the exact policy says. Q. What policy are you referring to? A. I think it's under driver -- is it under driver, accident -- I'm not even sure of the actual name of the policy. **I don't pay attention to it.**" Ex. 14, at 56:10-22 (emphasis added). According to Barrett, FedEx makes preventability judgments based on feelings: "it felt like we had enough to judge it preventable." Ex. 22, at 230:3-4 (judging Grimsley's accident); <u>see also</u> ¶ 44(a), <u>supra</u>.

### iii.    Disqualification Decisions Are Subjective.

FedEx's Safety Review Committee subjectively decides whether to disqualify a driver. The Company admits it has no policies or procedures as to the following:  what documents must be considered in a driver's safety review (Ex. 22, at 142:11-13); when the driver's accident history will lead to disqualification (Ex. 14, at 108:13-18); how much weight to attach to one rollover versus the rest of a driver safety review sheet (Ex. 22, at 114:14-19); explaining what is required before a driver can return to service (Ex. 14, at 246:6-9); or calling for automatic disqualification if it is determined that speed is a factor  (Ex. 22, at 222:21-223:8). <u>See also</u> ¶ 87, <u>supra.</u> FedEx also admits that it has no polices or procedures in place regarding the how driver safety reviews are conducted and/or documented – there are none saying:  that one member of

the Safety Review Committee has to refrain from voting in a disqualification decision (Ex. 22, at 104:23-105:3); what documents go into a disqualification file (id. at 156:23-157:1); or what documents go into a safety review file (id. at 157:2-4).

Thus, FedEx's undocumented decision-making processes are wholly subjective, demonstrating pretext and establishing a genuine issue of material fact. See Bryant v. Farmers Ins. Exchange, 432 F.3d 1114, 1126 (genuine issue of fact as to whether employer's incomplete files were accurate; employer's proffered reason for termination may have been pretext); Woods v. Boeing Co., 355 Fed.Appx. 206, at 210-11 (10th Cir. 2009) (with subjective evaluations, employer rated younger employees better than plaintiff; this was evidence of pretext).

### b. FedEx's Three-Part Explanation is Pretext.

Plaintiffs can show pretext by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." Garrett, 305 F. 3d 1210, 1217. FedEx's explanation of Plaintiffs' disparate treatment is pretext.

### i. "Anonymous" Driver Safety Reviews.

FedEx maintains that driver safety reviews (during which the Safety Review Committee would determine whether to disqualify a driver) were done anonymously. In other words, the committee members supposedly did not know who they were reviewing, and therefore, they could not have made decisions based on age. This is pretext.

First, driver safety reviews are hardly anonymous. FedEx acknowledges that **preventability** determinations are not anonymous – the individuals judging preventability know whose accident they are judging. See Ex. 14, at 92:6-9. Barrett participates in those accident judgments. See id. at 94:12-95:16; 109:25-110:2. Within days (in some cases, hours) of deciding

preventability, Barrett not only doubles as a Safety Review Committee member, but he even **leads** the driver safety review on that same driver.  <u>See</u> Ex. 14, at 109:14-19; Ex. 22, at 46:10-17; <u>see also, e.g.</u> Ex. 6 (timing). Thus, the lead member of the Safety Review Committee knows precisely who he is reviewing; there is no anonymity.

Second, FedEx tries to get around this by asserting that Barrett does not vote as to disqualification, preserving anonymity. But Barrett admits there is no policy or procedure in place requiring that he not vote; instead, this is his own device. <u>See</u> Ex. 22, at 104:23-105:3. Such impromptu and undocumented procedures are suspect to say the least, especially when Barrett describes Grimsley's driver safety review as malicious and intentional:  "we … took him down." Ex. 22, at 229:20-230:4; <u>see also</u> ¶ 44(a), <u>supra</u> (Barrett includes himself in the decision-making). Barrett's credibility is for the jury to decide. <u>See</u> <u>Rivera</u>, 868 F.Supp. at 297.

ii.        The June 21, 2010 Pre-Shift.

FedEx postures that a new "policy" was put in place through a pre-shift on June 30, 2010. And under this "policy," if a driver had a rollover where speed was a factor, the driver would be automatically disqualified. And because Plaintiffs' accidents occurred during this "heightened awareness," Plaintiffs' treatment was legitimate per company policy. This is all pretext.

First, a simple reading of the pre-shift shows that it put no such rule in place. It does not mention, or even imply, anything about automatic disqualification where speed is a factor. <u>See</u> Ex. 17. Second, FedEx admits that there was **never** a policy in place to the effect of "if you have a rollover where speed is a factor, you are automatically disqualified":  "A. There was a preshift that went out. Q. But it wasn't a written policy at FedEx? A. **Not a written policy, no. I don't believe we had a written policy on the speed issue.**" Ex. 22, at 222:21-223:8 (emphasis added).

Instead, the written policy that **was** in place at the time of Plaintiffs' accidents has a section for Disqualifying Events, including things such as DUIs, license revocation, and fleeing the scene. It does not include rollover accidents, which is the type at issue here. See Ex. 13, at 2729-30.

Third, FedEx has not produced a single document showing any policy, communication, or even the slightest implication that the new rule was "if you have a rollover where speed is a factor, you are disqualified." The only document it pretends to glean this from does not even mention speed. See Ex. 17. Instead, FedEx **made up** this "rule" during this litigation, in a feeble attempt to distinguish Ryan Lee's accident from the Plaintiffs'. Even if such a rule existed, **FedEx's own expert witness** testified that Lee was driving too fast. See Ex. 18, at 275:8-10.

Finally, Barrett testified on three separate occasions that the pre-shift was, unequivocally, not a policy. See Ex. 22, at 176:13-17; 197:12-20; 222:21-223:9 ("There was a preshift that went out. Q. But it wasn't a written policy at FedEx? A. **Not a written policy, no.**"; see also ¶ 52, supra. After a break, during which he spoke with FedEx's counsel, Barrett suddenly believed the opposite: "There was a preshift that was put out informing all of our drivers of the heightened focus that we were going to have on rollover accidents, and **I believe that's a written policy**." Ex. 22, at 243:10-13. Again, Barrett's credibility is for the jury. See Rivera, 868 F.Supp. at 297.

iii.    FedEx's 2008 Merger.

FedEx claims that six of the comparators worked for FedEx Freight **West**, and not FedEx Freight, **Inc.**, at the time of their accidents. See Mot. at ¶ 62. (This is premised on the Dec. 28, 2008 merger of FedEx Freight West, Inc. into FedEx Freight East, Inc. to change names to FedEx Freight, Inc.) FedEx asserts that those six were treated better because they operated under different policies and management than Plaintiffs. This is pretext (and false), for a few reasons.

First, the merger was a technical change that did not affect operations pertinent to this case. The key decision-makers (McNeely and Barrett) were the same decision-makers for all of those drivers, before and after the merger. Indeed, McNeely has been doing his job for fifteen years. Ex. 14, at 29:20-22. And Barrett has been doing his since 2006. Ex. 22, at 14:18-20.

Second, FedEx itself considers those employees as having been employed by FedEx Freight, Inc. In Bush's Request for Production No. 19, Plaintiffs requested document(s) "that show the date of birth and title of each and every individual employed by FedEx as a Line Driver or City Driver at any time between January 1, 2008 and the date of this discovery." (Plaintiffs had defined "FedEx" as "Defendant, FedEx Freight, Inc.") In response, FedEx produced a document listing all six of the comparators it now says were not employed by FedEx. See Ex. 71 (listing Russell Bezanson, Scott Smith, Ryan Wooten, Russell Ackerman, and Scott Kennepohl).

Third, even according to FedEx's website, FedEx Freight existed as early as 2002. See ¶ 56, supra; see also Exs. 37, 39. The East and West terms were merely geographic – FedEx's continued use of the terms FedEx Freight East and FedEx Freight West years after the 2008 merger confirms this. See ¶ 56, supra. The merger did not affect day-to-day operations for the drivers or decision-makers at a level pertinent to this case. See ¶ 56-57, supra.

In sum, the proffered reasons for Plaintiffs adverse treatment are pretext. See Riggs, 497 F.3d at 1114. Multiple genuine issues of material fact exist; summary judgment is therefore inappropriate. See Bryant, 432 F.3d at 1127.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny FedEx's Motion for Summary Judgment on Plaintiffs' First Claim for Relief.

Respectfully submitted this 11th day of June, 2013.

MARTINEZ LAW GROUP, P.C.

By: */s/ Ann E. Christoff*
  Meghan W. Martinez
  Ann E. Christoff
  720 South Colorado Boulevard
  South Tower, Suite 530
  Denver, Colorado 80246
  Telephone:  (303) 597-4000
  Fax:  (303) 597-4001
  E-mails:  martinez@mlgrouppc.com
  christoff@mlgrouppc.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2013, I filed and served a true and correct copy of the foregoing **RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' FIRST CLAIM FOR RELIEF** via the CM/ECF system, and via email to the following:

Raymond W. Martin (martin@wtotrial.com)
John P. Streelman (streelman@wtotrial.com)
Wheeler Trigg O'Donnell, LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202

*/s/ Beth Reinhardt*
Beth Reinhardt, Paralegal